**James R. SHARPTON and Melba I. Sharpton, Plaintiffs-Appellants,**

v.

**Gerald J. LOFTON, Jacqueline Lofton, Patsy J. Richter and Aetna Casualty and Surety Co., Defendants-Respondents.**

No. 50991.

Missouri Court of Appeals, Eastern District, Division Three.

Dec. 16, 1986.

Leonard Lomen, St. Louis, for plaintiffs-appellants.

Richard K. Zerr, St. Charles, for defendants-respondents.

KAROHL, Judge.

This appeal arises from plaintiff-grantors' attempt to set aside a general warranty deed to defendants Gerald and Jacqueline Lofton as grantees. Grantors, James and Melba Sharpton, also sought money damages from the Loftons for fraud in inducing plaintiffs to execute the sale contract and deed, and claimed damages for breach of oral contract promising to provide personal services to plaintiffs as additional consideration for the land. Finally, plaintiffs sought damages against defendant Patsy Richter, a notary public, and her surety, Aetna Casualty and Surety Company, because Ms. Richter notarized plaintiffs' signatures on the general warranty deed without plaintiffs personally appearing before her.

Defendants Lofton counterclaimed against plaintiffs alleging they had breached an express covenant in the warranty deed to defend title and an implied covenant of quiet enjoyment by filing this suit and two related notices of lis pendens. The case was tried in equity and the court entered judgment against plaintiffs on their entire petition and in favor of all defendants and found for defendants Lofton on their counterclaim. The court entered judgment for $3,000 in actual damages and $1,000 in punitive damages. Pursuant to plaintiffs' motion, the trial court later reduced the judgment for actual damages to $1,500 and the punitive damages to $1. Plaintiffs appeal. We affirm in part and reverse in part.

Plaintiffs James and Melba Sharpton are senior citizens residing in St. Louis County. Mr. Sharpton was 86 years old and Mrs. Sharpton was 75 years old during trial. The Sharptons have little formal education; Mr. Sharpton completed the fourth grade and Mrs. Sharpton may have finished the fifth. Before retiring, Mr. Sharpton was in the landscaping business which entailed driving a truck, laying sod and landscaping. Over his life, he bought two parcels of land and sold one before engaging in the transactions at issue. He considers himself intelligent, manages his own affairs and knew what he was doing while dealing with the Loftons. Mrs. Sharpton has become increasingly disabled over the years due to arthritis, surgery in 1981 and a stroke in 1983. Mr. Sharpton had to assume all the household chores and care for his wife, which became increasingly difficult as he aged.

The Loftons are much younger than the Sharptons. Mr. and Mrs. Sharpton had known Mrs. Lofton for about fifteen years. They were social friends when Mrs. Lofton was married to her previous husband. After her divorce, Mrs. Lofton moved away for a year then returned and married Mr. Lofton. She resumed visiting the Sharptons, seeing them several times each week.

The Sharptons owned an unimproved one acre lot adjacent to their home. This adjacent lot was worth about $15,000. In March, 1982, the Sharptons signed a written contract to sell this lot to a neighbor for $15,500. After the contract was signed, Mr. Sharpton found out the neighbor was planning to fence in the lot for his dog. Mr. Sharpton requested that the neighbor "return the lot back to us because [the dog] was too close and would annoy the wife." Mr. Sharpton recognized that the neighbor "could have held me to the lot if he had wanted to."

About a month later, Mr. Sharpton initiated discussions with the Loftons about selling the lot to them. Mr. Sharpton thought that if he sold the lot for a lower price, then the Loftons would help him to take care of his wife and home. He wanted the Loftons to build their house on the purchased lot so that they could be available to help him. He offered to sell the lot to the Loftons for $3,000. They accepted. Three thousand dollars was the entire consideration recited in the contract, although Mr. Sharpton understood that the additional consideration would be that "she would

help me take care of the wife and he would help me take care of the yard."

The Loftons and the Sharptons had many conversations regarding this transaction over the next two months, but the exact consideration for the sale remained vague. Mrs. Lofton visited frequently and testified that she always offered to help Mr. Sharpton. She expected that she might continue to be able to help him from time to time. The Loftons testified, however, that the only personal services they ever agreed to was to be sure plaintiffs were buried properly after their deaths. The Sharptons knew that the Loftons lived in St. Charles, worked full time and could not be readily available to help them until they built their new house on the purchased lot.

On June 22, 1982, the Loftons came by the Sharptons' home and brought the sale contract which Mrs. Lofton had arranged to have drafted by a real estate agent, a friend of hers. The contract specified only the purchase price and did not mention any agreement to take care of the Sharptons. All parties knew that the market value of the land was substantially greater than the purchase price. The parties signed the contract and deed.

Mr. Sharpton both denied and admitted his signature and that of his wife. Both plaintiffs recalled signing only one document, the deed, although two signatures were on both the deed and the contract. Mr. Sharpton said that he understood the significance of what he was doing, had sold real estate before, but called the sales contract a "sales slip" and appeared confused regarding the effect of the sale. Defendants produced a qualified hand-writing expert at trial who identified the signatures as those of plaintiffs.

The documents were not notarized when signed. A few days later, Mrs. Lofton took them to her friend, defendant Patsy Richter, who was a notary public. Ms. Richter admitted that she notarized the plaintiffs' signatures without having plaintiffs before her or telephoning them to verify the signatures. The Sharptons testified that Mrs. Lofton was to bring a notary to their house

later to notarize the signatures. Mrs. Lofton testified that she offered to have a notary come over to the Sharptons' house, but that Mr. Sharpton refused because the house was too dirty saying, "Oh, Jackie, you don't have to do that. Just I will sign it and the wife here will sign it, and you just get it notarized and give me the $3,000 and everything will be fine."

In August or September of 1982, Mr. Sharpton approached Mrs. Lofton and asked her to give the lot back. His motivation was disputed. Mr. Sharpton said that, after they signed the "sales slip," he saw Mrs. Lofton only two or three more times at his home but this was because "I told her to stay away from there." Since the deed and contract were signed, Mr. Sharpton testified that Mr. Lofton took care of cutting the lot's grass, but that he "didn't want anything more to do with [Mr. Lofton] because he wasn't doing what he was supposed to be." Apparently, Mr. Lofton had told a neighbor that he would not push a lawn mower for "that old man." Mr. Lofton wanted to use a riding mower. This remark made Mr. Sharpton angry. A month or so later, Mr. Sharpton wanted to cancel the deed because "I found out there was something fishy about this deed that wasn't signed ... by a notary public." In his deposition, denied at trial, Mr. Sharpton said that he told Mrs. Lofton that "I didn't want [Mr. Lofton] around no more." Finally, Mr. Sharpton complained at trial that the Loftons failed to "get things done", that they went bowling and watched football games each weekend instead of helping him.

Mrs. Lofton testified that Mr. Sharpton just asked her to see that "they were put away properly." She recalled no mention, during their many discussions, of Mr. Sharpton's desire that she and her husband perform personal services for the Sharptons. She did agree, during cross-examination, that she expected that she "might be able to help him out or help him from time to time." The Loftons put their home up for sale but could not begin constructing their new home on the lot, as Mr. Sharpton

wanted, until their present home was sold. Mr. Sharpton asked for the lot back between 60 and 90 days after the documents were signed because he became angry with Mr. Lofton.

Mr. Sharpton asked for the lot back, was refused, then hired an attorney to set the deed aside. Mr. Sharpton also had his attorney file two notices of lis pendens, the second substituted for the first, in order to "block" the Lofton's use of the lot.

On appeal, the Sharptons assert six claims of error: 1) that they were entitled to summary judgment absent affidavits from the Loftons maintaining a disputed factual issue; 2) they were entitled to a summary judgment to void the deed because the notary undisputedly failed to notarize the documents in plaintiffs' presence and by their authority; 3) the court's judgment for the Loftons on plaintiffs' claim of fraud was against the weight of the law and evidence; 4) the judgment for the Loftons on plaintiffs' breach of oral contract claim was against the weight of the law and evidence; 5) the judgment for the notary and her surety on plaintiffs' claims was contrary to the law and evidence; 6) the court erred in finding for the Loftons on their counterclaim for slander of title because the first lis pendens did not constitute slander of title, the second notice caused no damage and both filings are privileged. We affirm in part and reverse in part, addressing plaintiffs' points in order.

■ The Sharpton's first two points assert error in denying their motions for partial summary judgment which requested the court to order the recorded deed removed from the records of the recorder's office because the acknowledgement was fraudulent. The factual contention is that on undisputed evidence available by affidavits and answers to interrogatories the Sharptons did not appear before a notary public, defendant Richter, as shown on the deed acknowledgement. Defendants Lofton contend that the order overruling the request for partial summary judgment is not appealable. That is the usual rule.

*Parker v. Wallace*, 431 S.W.2d 136, 137 (Mo.1968) and *Guthrie v. Reliance Construction Company, Inc.*, 612 S.W.2d 366, 368 (Mo.App.1981). The reason for this general rule is that only final judgments disposing of all parties and all issues are appealable. Section 512.020 RSMo 1978. However, in the present case, plaintiffs preserved the claim of error in their motion for new trial and bring the issue after trial and after final judgment. We discern no reason why the denial of a motion for summary judgment cannot be preserved and support a claim of error of law after final judgment. If plaintiffs were entitled to partial summary judgment on undisputed facts and as a matter of law when their motion was overruled, then they are entitled to preserve the error. Otherwise, a party who fails to oppose a motion for summary judgment receives the benefit of a ruling which is wrong as a matter of law when entered. We review these claims on their merits and find no error.

■ Plaintiffs filed two motions for partial summary judgment. Both were denied without findings or comment. The motions were directed only at a request that the trial court order the recording of the warranty deed removed from the recorder's records. In support of the motions, plaintiffs offered their affidavits that they did not sign the deeds before a notary public and that the acknowledgment was false under § 442.130 RSMo 1978. The second motion also relied on answers to interrogatories filed by the notary. The motions were not supported by any claim or any evidence that plaintiffs did not sign the deed or that their signatures were fraudulently obtained. The subsequent trial evidence was that they did sign the deed and there was evidence from which the trial court found at trial that their signatures were not obtained by fraudulent acts of any defendant. Accordingly, the deed took effect when signed and delivered, *Robb v. N.W. Electric Cooperative*, 297 S.W.2d 385, 389 (Mo.1957), and the acknowledgment was not a requirement for validity of the deed between the parties. *Id.* There-

fore, there remained an issue of fact on the validity of the deed at the time the court considered plaintiffs' partial motions for summary judgment. That issue was whether the deed was valid. If the deed was valid between the parties, there remained a question of law whether plaintiffs had standing to request the relief requested in the partial motion for summary judgment.

In *Robb*, the court found that a utility easement was valid and the grantors of the easement had a right to have the recorded easement removed from the records because of the subsequent fraudulent notarization on facts similar to the present case. However, the easement had a continued effect on property which the grantor-plaintiffs continued to own. That is not true in the present case where the warranty deed divested plaintiffs of all interest in the real estate described in the recorded deed. The logic of this result is that if the trial court subsequently and correctly found the deed to be valid, then removal of the recording would not benefit the plaintiffs. They would not be aggrieved by the subsequent recording of a deed valid between the parties.

In reviewing the third, fourth and fifth points, we note that this case was tried by the court sitting in equity. Upon review of an equitable decree this court will sustain the trial court's action unless there is no substantial evidence to support it, it is against the great weight of the evidence or it erroneously declares or applies the law. Rule 73.01 and *Baker v. McCue-Moyle Development Co.*, 695 S.W.2d 906, 911 (Mo. App.1984). We review the facts in the light most favorable to the result reached. *Id.*

In their third point plaintiffs assert that the law and weight of the evidence mandated the trial court's finding in their favor on their claim of fraud.

The tort of fraud and deceit consists of "a representation; its falsity; its materiality; the speaker's knowledge of the falsity or his ignorance of its truth; the speaker's intent that his statement should be acted upon by the person and in the manner reasonably contemplated; the hearer's ignorance of the falsity of the statement; his reliance on its truth; his right to rely thereon; and his consequent and proximately caused injury" (citation omitted).

*Osterberger v. Hites Construction Co.*, 599 S.W.2d 221, 227 (Mo.App.1980).

■ The trial court concluded that any representations made by the Loftons were not material to the transfer, that there is insufficient evidence to show that any representations were made which the Loftons knew were false when made and that no evidence shows the Sharptons relied on any representations in agreeing to transfer the property or that the Sharptons were without knowledge of the falsity of any representation made by the Loftons. There is substantial evidence to support these findings. They are not against the weight of the evidence. The Sharptons initiated this transaction. Mrs. Lofton testified that she always offered to help the Sharptons and that she helped them after the land transfer. Both Loftons testified, however, that the only personal service they promised to perform was to see the Sharptons were buried properly. Cash was the only consideration mentioned in the sale contract and the deed. Mr. Sharpton waited almost three months to try to get the land back. The Loftons listed their house for sale, intending to build on the disputed lot.

■ Plaintiffs' fourth claim of error asserts that the trial court's judgment against them on their claim for breach of oral contract was contrary to the law and weight of the evidence. Plaintiffs' second amended petition asserts a claim "for the breach of oral contract to provide services in exchange for the reduction of the cost purchase price for certain real property ..." The trial court found that plaintiffs "wholly failed to prove that ... defendants ... entered into an oral agreement whereby in consideration of a reduction of the cash purchase price of said real property to $3,000, defendants ... would provide a va-

riety of household services for plaintiffs ..."

We find the trial court's conclusion supported by the evidence and the law of contracts. Accepting the evidence in the light most favorable to the plaintiffs, we conclude that it is insufficient to establish an enforceable contract. The Loftons testified that the only specific services they agreed to render were to see plaintiffs properly buried. Mr. Sharpton provided no evidence specifying exactly what he expected the Loftons to do beyond the idea that "she [would] help me take care of the wife and her husband [would] help me take care of the yard." To constitute a contract, there must be mutual understanding of facts entering into such contract and nothing can be left to conjecture. *Chagnon v. Shampaine Industries, Inc.,* 412 S.W.2d 519, 526 (Mo.App.1967). A court may enforce a contract only if the offer and acceptance are sufficiently specific on terms of the contract to manifest the parties' assent to those terms. *Hyken v. Travelers Insurance Co.,* 678 S.W.2d 454, 458 (Mo. App.1984). These standards are not met by the evidence. It is not necessary that we consider the pleaded defense of the statute of frauds or the exception based on full performance by a party.

Plaintiffs' fifth and sixth points assert that the trial court's judgment for the notary and her surety was against the weight of the evidence and that these defendants should be liable to them for all damages proximately caused by the notary's official misconduct. The parties agree that plaintiffs were not before the notary, Patsy Richter, when she notarized their signatures. There was sufficient evidence before the court to show that the Sharptons did not want the notary to come to their home and that they agreed to having their signatures notarized later, outside their presence. "Absent some circumstance requiring a different rule, which is not present in this case, it is the general rule that a deed takes effect upon delivery thereof (citations omitted). Except in certain limited situations, (citations omitted),

none of which are here applicable, an acknowledgment is not a requirement for the validity of a deed between the parties (citations omitted)." *Robb v. N.W. Electric Power Cooperative,* 297 S.W.2d 385, 389 (Mo.1957). Plaintiffs admitted during trial that they freely signed the deed and sale contract, knew what they were doing, and later sought to set the deed aside. Even if the notary acted in an irregular manner, the evidence supported a finding that the acts were authorized. In addition, plaintiffs have failed to show how they were damaged or how the added notarization was one of the proximate cause of any loss. Absent such proof, they were correctly denied recovery. *State v. Hammett,* 240 Mo. App. 307, 203 S.W.2d 115, 120 (1947).

In their final point, plaintiffs aver error in finding for defendants on their counterclaim. Defendants' counterclaim asserts that the Sharptons agreed by warranty deed to defend title for the Loftons and breached this warranty by filing their petition to set aside the deed, their notice of lis pendens on December 3, 1982, and their notice of lis pendens on February 16, 1983. Defendants also claim that plaintiffs committed slander of title by filing their first notice of lis pendens before their petition was filed on February 16. The trial court found that plaintiffs breached their warranty to defend title under the deed by filing the petition and the two notices of lis pendens. The court also found that plaintiffs committed slander of title by filing the first notice of lis pendens before any suit was initiated and by filing the second notice of lis pendens knowing that the deed was effective and that defendants had fully complied with their obligations under the sale contract.

We reverse the trial court's action on defendants' counterclaim for several reasons. First, defendants' theory asserting breach of warranty of good title fails to state a claim as a matter of law. Second, plaintiffs' action in filing their two notices of lis pendens was not slander of title.

As to defendants' failure to state a claim for breach of warranty to defend.

title, we note that defendants have misconstrued the nature of a warranty deed and the warranties therein.

In Missouri, a warranty deed contains the following covenants; seisin, good right to convey, against encumbrances, further assurances, quiet enjoyment and warrant and defend. It should be noted that the covenants of seisin, good right to convey and against encumbrances *are warranties or representations of an existing state of affairs and if there is any breach of these covenants it is when the conveyance is made* [in praesenti]. On the other hand, the covenants for further assurances, quiet enjoyment and to warrant and defend are strictly covenants and breach of these *covenants takes place at some future time other than at the date when the conveyance is made.* Rawle, Covenants for Title § 205 (5th ed. 1887); Hunter, Covenants for Title As Protection to Remote Grantees; 3 Mo.L.Rev. 48 (1938); Hardy, Measure of Damages Where Breach of Covenant for Title, 4 Mo.L.Rev. 194 (1939); Simonton, Statutory Covenants for Title in Missouri, 28 U. of Mo.Bull.L.Ser. 3 (1923); 20 Am.Jur.2d Covenants, §§ 50–100. "The covenant for quiet enjoyment is understood as covenanting that *no one with a better right to possession will interfere with the grantee's possession,* and it is breached, if at all, by eviction. The covenant for warranty is understood as covenanting that one will warrant and defend against all lawful claims of third persons, and it is breached, if ever, by the warrantor failing to so defend." Hunter, supra, 3 Mo.L.Rev. at 50. *A.C. Drinkwater Jr., Farms, Inc. v. Ellot H. Raffety Farms Inc.,* 495 S.W.2d 450, 455–56 (Mo.App.1973) (our emphasis).

Plaintiffs have challenged the validity of the deed and land sale contract. If the deed were to be set aside, then the warranties within it would be of no effect and plaintiffs would not be bound to defend for defendants to the extent of their title granted as against third parties. Sellers do not breach their warranty to defend title when they sue to set the warranty deed aside. Such suit is not an attack on seller's good title. The warranty to defend does not operate to prevent seller's attack on the deed. Defendants have failed to state a legally cognizable claim for breach of warranty.

We also find that plaintiffs did not commit slander of title by filing two notices of lis pendens. Plaintiffs' first notice informed defendants and third parties that a suit affecting title of the land was about to be filed and plaintiffs' second notice stated that the suit was in fact filed. Defendants do not claim that plaintiffs did not file the notices of lis pendens correctly as required under § 527.260 RSMo 1978. Rather, defendants assert that the filing of such notice constitutes slander of title. Such an assertion is contrary to Missouri law, which holds that an absolute privilege attaches to the filing of the lis pendens as long as the notice has a reasonable relation to the action filed. *Houska v. Frederick,* 447 S.W.2d 514, 519 (Mo.1969). Defendants do not and cannot argue that these filed notices do not bear a reasonable relation to plaintiffs' action to set aside the deed. As such, they are privileged under Missouri law.

We reverse the judgment and damages awards for defendants on their counterclaim and affirm the remaining judgment. Costs are assessed one-half to appellants and one-half to respondents.

PUDLOWSKI, P.J., and CRANDALL, J., concur.