Angela HAMMER, Appellant,

v.

George WATERHOUSE,
M.D., Respondent.

No. WD 49549.

Missouri Court of Appeals,
Western District.

Jan. 24, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 28, 1995.

Application to Transfer Denied April 25,
1995.

Zel M. Fischer, Rockport, for appellant.

Randa Rawlins, Kansas City, for respondent.

Before FENNER, C.J., P.J., and HANNA and LAURA DENVIR STITH, JJ.

FENNER, Chief Judge.

Appellant, Angela Hammer, by and through her mother and Next Friend, Deneise Bird, appeals the judgment of the Circuit Court of Jackson County, Missouri, against her and in favor of respondent, Dr. George Waterhouse.

Angela brought suit against Dr. Waterhouse and others for medical malpractice. As a brief background, Angela was born with a congenital heart defect known as pulmonary stenosis.[1] In December of 1979, Dr. Antoni Diehl at Children's Mercy Hospital in Kansas City, Missouri (Children's Mercy), recommended surgical correction of Angela's pulmonary stenosis. Shortly thereafter, when Angela was five years old, she underwent surgery to correct this condition. The surgery was performed on May 5, 1980 by Dr. Keith Ashcraft and Dr. George Waterhouse, a visiting surgery resident at Children's Mercy. Angela was released from the hospital on May 9, 1980, apparently in good condition.

On May 24, 1980, Angela became ill and was vomiting. On that day, Angela's mother took her to see Dr. Olin Mauldin at Prime Health. Dr. Mauldin diagnosed Angela as having the flu. On May 27, 1980, Angela's mother believed that Angela was well enough to return to preschool. When Angela's mother picked her up at preschool that day, the school advised her that Angela had been queasy and slept most of the afternoon.

On May 28, 1980, Mrs. Bird had her sister babysit Angela at home rather than send her to school. At 11:00 a.m., Mrs. Bird called home and learned that Angela's color was bad. Mrs. Bird went home from work and, according to Mrs. Bird's testimony, Angela's "mouth was real blue, and her gums were purple, and her skin was real gray looking, and she just looked real sick." Mrs. Bird took Angela to see Dr. Ronald Nicholis, and from there Angela was transported by ambulance to Children's Mercy.

Upon arrival at the hospital, Angela was seen by Dr. Waterhouse and another physician. Dr. Waterhouse told Mrs. Bird that fluid had built up around Angela's heart (a condition known as cardiac tamponade) that would have to be removed by surgical procedure.[2] The procedure was to be performed by Dr. Thomas Holder who was involved in another operation at the time. During the procedure, which was performed by Dr. Holder, Angela suffered a heart fibrillation[3] and her brain was without oxygen for six minutes. As a result of the oxygen deprivation to her brain, Angela was rendered a spastic quadriplegic and mentally impaired.

Angela brought suit against the physicians and institutions alleged to be negligent, including Dr. Waterhouse. Angela filed her original Petition for Damages on April 8, 1991, naming as defendants Dr. Olin Mauldin, Dr. Antoni Diehl, Pediatric Surgical Associates, P.C., Dr. Keith Ashcraft, Dr. Thomas Holder, Dr. George Waterhouse, Humana, Inc., d/b/a Humana Prime Health, and Children's Mercy. In her petition, Angela alleged joint and several liability among the defendants for medical negligence. Angela filed a First Amended Petition for Damages

---

1. Pulmonary stenosis is defined as a narrowing of the orifice of the pulmonary trunk, the arterial vessel arising from the right ventricle and giving rise to the right and left pulmonary arteries. *Blakiston's Gould Medical Dictionary* 1131 (4th ed. 1979).

2. Cardiac tamponade is defined as "[c]ompression of the heart by fluid within the pericardium, which hinders venous return, restricts the heart's ability to fill, and produces increased systemic and pulmonary venous pressure and decreased cardiac output." *Blakiston's Gould Medical Dictionary* 227 (4th ed. 1979).

3. Fibrillation is defined as "[v]ery rapid irregular noncoordinated contractions of the heart." *Blakiston's Gould Medical Dictionary* 505 (4th ed. 1979).

on April 14, 1993, naming as defendants Dr. George Waterhouse, Dr. Rengasamy Gowdamarajan (Dr. Rajan), Dr. John Bandy, Dr. James Kauten, and Children's Mercy.

On November 24, 1993, Angela filed a Motion for Partial Summary Judgment on the issue of liability against Dr. Waterhouse, the only defendant remaining in the lawsuit.[4] Angela alleged that Dr. Waterhouse was acting in concert with the other physicians treating Angela at Children's Mercy whom Dr. Waterhouse admitted were negligent. Therefore, Angela alleged, Dr. Waterhouse is vicariously liable for the negligence of those other physicians, and is jointly and severally liable for the injuries caused to Angela by that negligence. On January 19, 1994, however, the trial court denied Angela's Motion for Partial Summary Judgment.

After trial by jury, a verdict was entered against Angela and in favor of Dr. Waterhouse and the court entered judgment accordingly on February 24, 1994. Angela filed a Motion for Judgment Notwithstanding the Verdict or, in the alternative, Motion for New Trial on March 7, 1994, which motion was denied. This appeal followed.

## I.

In her first point on appeal, Angela argues that the trial court erred in refusing to grant her motion for summary judgment and motion for directed verdict on the issue of liability as a matter of law because Dr. Waterhouse "judicially admitted vicarious liability in that he admitted in interrogatory answers and in testimony that those with whom he was acting in concert were negligent and that their negligence caused [Angela's] damages."

■ Initially we note that a denial of a motion for summary judgment is not subject to appellate review. *Southwest Regional Joint Bd. of Amalgamated Clothing & Textile Workers Union v. Barcus,* 860 S.W.2d 29, 31 (Mo.App.1993) (citations omitted). Thus, insofar as Angela's claim challenges the denial of her motion for summary judgment, such claim is not subject to our review and is denied.[5]

Angela's point on appeal, however, also challenges the trial court's denial of her motion for directed verdict on the issue of liability which motion was filed on February 23, 1994. We review this challenge in Angela's first point.

■ Appellate review of a denied directed verdict motion is a question of law. *Lee v. Hartwig,* 848 S.W.2d 496, 500 (Mo.App.1992). A trial court should grant a directed verdict only if reasonable persons would not differ on the correct disposition of the case. *Id.* Directed verdicts in favor of the parties bearing the burden of proof are not favored, and are considered drastic. *Id.* However, a directed verdict may be granted against a defendant when he admits in pleadings, by counsel, or in individual testimony to the truth of the basic facts supporting the plaintiff's claim. *Id.* As was stated in *Coleman v. Jackson County,* 349 Mo. 255, 160 S.W.2d 691, 693 (1942):

> It is a generally accepted rule in this state that a verdict may not be directed in favor of the proponent, that is the party upon whom the law casts the final burden of proof.... There is, however, a well-recognized exception to the rule. *If the opponent, that is the party not having the burden of proof, admits either in his pleadings or by counsel in open court or in his individual testimony on the trial the truth of the basic facts upon which the claim of the proponent rests, a verdict may be directed against him,* and if the proof is altogether of a documentary nature and the authenticity and correctness of the documents are unquestioned, and if such proof establishes beyond all doubt the truth of facts which as a matter of law

---

4. All parties defendant other than Dr. Waterhouse were ultimately dismissed after settlement or otherwise.

5. Appellant argues that *Sharpton v. Lofton,* 721 S.W.2d 770, 774–75 (Mo.App.1986), holds that the denial of a motion for summary judgment is subject to appeal. Although *Sharpton* addresses, in part, the denial of two motions for partial summary judgment on the merits, the case does not address the established precedent holding the denial of a motion for summary judgment is not subject to appeal. We find no cases which follow *Sharpton* on this question and we decline to accept it as precedent.

entitled the proponent to the relief sought, and such proof is unimpeached and uncontradicted, the proponent will be entitled to a peremptory instruction. *This is upon the theory that there is no question of fact left in the case and that upon the questions of law involved the jury has no right to pass* (emphasis added).

Missouri courts have often quoted and applied the rule set forth in *Coleman*. *Brandt v. Pelican*, 856 S.W.2d 658, 664 (Mo. banc 1993). In *Brandt*, the Missouri Supreme Court stated:

Except for the part of the *Coleman* rule concerning undisputed documentary proof, *a directed verdict is not given in favor of the party having the burden of proof no matter how overwhelming that party's evidence may be or how miniscule the other party's evidence may be*; a directed verdict in favor of the party having the burden of proof (usually the plaintiff) is never based upon the plaintiff's evidence. This is in recognition of the fact that the defendant, who has the benefit of the burden of proof, is entitled to try the case with no evidence at all and to rely solely upon the jury disbelieving the plaintiff's evidence. This strategy may result in a loss for the defendant, but it will not be on a directed verdict; *the defendant is entitled to have the case go to the jury*.

*Id.* at 664–65 (emphasis added).

■ To make a prima facie case of medical malpractice, plaintiff must establish that the act or omission of the defendant failed to meet the requisite medical standard of care, the act or omission was performed negligently, and there was a causal connection between the act or omission and the injury sustained by the plaintiff. *Tompkins v. Kusama*, 822 S.W.2d 463, 464 (Mo.App.1991). With regard to vicarious liability for the negligence of another physician, the general rule is that physicians independently employed or acting independently in the case are not vicariously liable, unless the one observed, or, in the exercise of ordinary care, should have observed, the wrongful act of the other. *Crump v. Piper*, 425 S.W.2d 924, 928 (Mo. 1968). Vicarious liability has been imposed in some circumstances where the physicians

were jointly employed or were acting jointly or "in concert" in the case. *Id.* In the verdict director submitted by appellant (Instruction No. 6), "acting in concert" is defined as "two or more persons ... acting jointly, not independently, to plan, agree on and provide medical care."

■ Even though doctors may share responsibility for the care and treatment of the patient, Dr. A is not liable for the negligent treatment given by Dr. B if Dr. A exercised no control over Dr. B's treatment of the patient and there is no evidence that Dr. A had any right to do so. *Bottger v. Cheek*, 815 S.W.2d 76, 82 (Mo.App.1991). In other words, if the evidence fails to show that Dr. A (who is being sued for medical malpractice based upon the negligence of Dr. B) controlled or had the right to control Dr. B in the performance of Dr. B's professional duties, Dr. A cannot be held vicariously liable for the negligence of Dr. B even though they shared responsibility for the patient's care and treatment. *Id.*

In her brief, appellant asserts that the "evidence adduced prior to trial, and at trial, from Dr. Waterhouse, himself, shows beyond any doubt that Dr. Waterhouse was acting in concert with several other providers in providing health care for [appellant]. Dr. Waterhouse admitted that physicians' he was acting jointly and in concert with were negligent and that their negligence caused, or contributed to the cause of [appellant]'s injuries." Appellant provides numerous cites to the trial transcript and legal file in support of her argument.

■ In order to demonstrate that she is entitled to a directed verdict, Angela must show that Dr. Waterhouse, either in his own trial testimony or in his pleadings, admitted the truth of the basic facts upon which Angela relies. In other words, Angela must demonstrate that Dr. Waterhouse admitted (1) that he was acting "in concert" with Dr. Bandy and/or Dr. Rajan, (2) that Dr. Bandy and/or Dr. Rajan were negligent, and (3) that the negligence of Dr. Bandy and/or Dr. Rajan caused the damages or injuries claimed by appellant.

■ We find that Angela has failed to demonstrate that Dr. Waterhouse admitted (1) that he was acting "in concert" with Dr. Bandy and/or Dr. Rajan, and (2) that Dr. Bandy and/or Dr. Rajan were negligent. Thus, Angela is not entitled to a directed verdict, and the trial court did not err in denying Angela's motion for a directed verdict on the issue of liability.

■ We reject appellant's argument that Dr. Waterhouse's interrogatory answers constituted judicial admissions of negligence and concerted action which were binding on him at trial. First, the interrogatory answers did not even address the issue of concerted action, and thus clearly did not provide a basis for a binding judicial admission on that issue. Second, once a trial court denied appellant's summary judgment motion, he exercised his discretion in permitting Dr. Waterhouse to amend his interrogatory answers to delete the language which appellant contends constituted an admission of negligence on the part of the other doctors. As the trial court recognized, such superseded interrogatory answers could not be used as binding judicial admissions, but could at most be used as admissions against interest.[6]

Appellant alternatively argues that the evidence adduced at trial indicates, beyond any doubt, that Dr. Waterhouse was acting jointly and in concert with Drs. Bandy, Ashcraft, Holder, and Rajan in diagnosing and providing treatment to appellant. We disagree.

Dr. Waterhouse testified at trial that in May of 1980, he was working at Children's Mercy under Drs. Holder, Ashcraft and Amoury on a rotating residency from Vanderbilt University. Dr. Kauten was a junior resident doing his rotation at Children's Mercy at the time in question. Dr. Waterhouse testified that he was not allowed to do a surgical procedure on the patients of Drs. Holder and Ashcraft without their permission.

On May 28, 1980, Dr. Waterhouse was observing Drs. Holder and Baldwin perform a complicated operation in the operating room suite at Children's Mercy on a patient (not appellant). During that operation, a call came to Dr. Holder, while Dr. Waterhouse was present, indicating that Angela Hammer was coming to the hospital. Dr. Holder asked Dr. Waterhouse to go to the emergency room to "sort out" Angela's condition. Dr. Waterhouse testified that he was sent to the emergency room as Dr. Holder's representative to examine Angela.

Dr. Waterhouse testified that he and Dr. Bandy were "in the emergency room together seeing Angela." Dr. Kauten, the junior resident, was also present. Dr. Waterhouse stated that he agreed with Dr. Bandy's tentative diagnosis of pericardial tamponade. Dr. Waterhouse testified that Angela's condition on May 28, 1980 (cardiac effusion and tamponade) was a known complication of the surgery that was performed on Angela on May 5, 1980 to correct her congenital heart defect.

Dr. Waterhouse testified that he called Dr. Ashcraft, Dr. Holder's partner, at his home from the emergency room as Dr. Waterhouse knew that Dr. Holder was tied up in surgery. Dr. Waterhouse told Dr. Ashcraft that Angela needed immediate treatment and that Dr. Ashcraft should come to the hospital. Dr. Ashcraft apparently decided that Dr. Holder could take care of it.

Dr. Waterhouse further testified, in relevant part, as follows:

> I went back to the operating room, in person, on foot, walked into the operating room, interrupted Dr. Holder's operation, told him what was going on with Angela. And, again, in specific detail that she was cyanotic; that she was poorly profused; that she had tachycardia; that she had what appeared to be an obvious tamponade; and she was going to need what I thought was surgical treatment. Dr. Holder was aware of that, and I went back to the emergency room and somewhere in there, and I don't recall the specifics of doing it myself or whether Holder or one

---

**6.** *See DeArmon v. City of St. Louis,* 525 S.W.2d 795, 803 (Mo.App.1975). Because of our resolution of the above issue, we do not need to reach the question whether the trial court should have excluded the interrogatory answers from evidence entirely because they did not constitute admissions at all. *See Foster v. Bi–State Dev. Agency,* 668 S.W.2d 94 (Mo.App.1984); *Macheca v. Fowler,* 412 S.W.2d 462, 465 (Mo.1967) (legal conclusions are not admissions).

of his nurses in the operating room did it, but was communicated that Dr. Rajan would be called to do an echo[cardiogram].

Dr. Waterhouse testified that he did not specifically recall talking to Dr. Rajan that day, but that an echocardiogram was ordered and was done expeditiously. The test showed that Angela had a large effusion behind her heart. Dr. Rajan apparently reported the test results to Dr. Holder.

Dr. Waterhouse testified, "My impression of this situation was that it was extremely risky. Trying to tap it would result in sticking the heart and would probably result in an arrest in a situation that was going to be very difficult. I felt that this was way over my head."

Dr. Waterhouse further testified, in relevant part, as follows:

Q. [attorney for defendant/respondent] Did you consider yourself experienced at that time in the sense of performing a tap on the posterior effusion in Angela Hammer?

A. [Dr. Waterhouse] Definitely not. I thought that dealing with this called for the most experienced thoracic surgeon we had in the hospital.

\* \* \* \* \* \*

Q. Did you ever receive instructions or permission from Tom Holder to proceed with a tap?

A. I did not receive any specific instructions from Tom Holder to tap her. In essence Tom Holder told me exactly what to do, and it was not that he said not to tap her, it was that he gave me instructions as to what to do which was to bring her from the echo room to the holding room and that he would do it. Whatever—

\* \* \* \* \* \*

Q. Did any attending physician at Children's Mercy that day tell you or give you permission to proceed with the tap?

A. Definitely not.

\* \* \* \* \* \*

Q. Who else was present in the operating room when you got [Angela] in there besides you and Dr. Holder?

A. Well, this is, I think, the operating room worksheet, and it lists Dr. Holder, it lists myself, it lists Dr. Kauten, it lists Dr. Pitsch, who was another resident.... [Kauten and Pitsch] came along to help.

Dr. Waterhouse testified that Dr. Holder elected to try a pericardiocentesis (or tap) on Angela. Dr. Waterhouse "prepped" Angela's skin while Dr. Holder prepared to do the procedure. When Dr. Holder proceeded to do the pericardiocentesis, it resulted in fibrillation of Angela's heart.

Dr. Waterhouse further testified:

Q. Do you believe that anybody at Children's Mercy that day on May 28th was negligent in caring for [Angela]?

A. I believe that Angela Hammer was in Children's Mercy Hospital at the end of some period of illness, and that she was there for somewhere between an hour and 15 and an hour and 25 minutes, had a couple of tests done before she got to the operating room, and was in a place where the person best qualified to take care of her [Dr. Holder] had an opportunity to take care of her. She had a terrible, tragic outcome. I wish I could say that doctors could fix everybody that they see, but I believe from the bottom of my heart that I did what I could do to put her in a position that would satisfy her life, and that the people at Children's Mercy Hospital did what they could do as well as they could do it to have an outcome that would allow Angela to live a normal life. It didn't work out that way and it's tragic but we sure tried.

\* \* \* \* \* \*

Q. In that amended interrogatory answer, Dr. Waterhouse, did you say anywhere that Dr. Rajan or Dr. Bandy were negligent in their treatment of Angela Hammer?

A. I did not.

Q. Or anyone at Children's Mercy Hospital?

A. *I have never said in deposition or this court that I claimed that anyone was negligent.*

\* \* \* \* \* \*

Q. *On May 28th, 1980, did you have control over what John Bandy was doing in the emergency room?*

A. *Certainly not.*

Q. *Did you have control over what Dr. Rajan was doing up in the cardiology lab?*

A. *No.*

Q. Did you have any control over what Tom Holder was doing in the hospital that day?

A. Certainly not.

Q. Did you have any control over Keith Ashcraft?

A. Certainly not.

Q. *Did you need John Bandy or Dr. Rajan to make a diagnosis in this case?*

A. *I made my diagnosis in the emergency room independent of Dr. Bandy. Dr. Rajan helped me with the diagnosis by performing the echo.*

Q. *Did you make a joint diagnosis with either one of those gentlemen?*

A. *No.*

Q. Did you have any discussions with Dr. Bandy or Dr. Rajan that day about not performing a tap on Angela Hammer?

A. Not to my recollection (emphasis added).

 The record does not reflect that Dr. Waterhouse admitted that he acted "in concert" with Dr. Bandy and/or Dr. Rajan or that he admitted that Dr. Bandy and/or Dr. Rajan were negligent. On this basis, Angela was not entitled to a directed verdict, and the trial court did not err in denying Angela's motion for a directed verdict on the issue of liability.

Angela's first point is denied.

## II.

In her second point on appeal, Angela argues that the trial court erred in not directing the verdict for Angela on the issue of liability because liability was judicially admitted in that Dr. Waterhouse testified that he was responsible for Angela's condition.

Specifically, Angela argues that Dr. Waterhouse admitted personal fault in causing Angela's damages by the following colloquy:

Q. [attorney for plaintiff/appellant] Is Dr. Ashcraft listed as one of the individuals who you believe caused or contributed to Angela's injuries?

A. [Dr. Waterhouse] Well, just to cut to the chase, Mr. Grissom, I'm the only one sitting here, and I certainly don't believe that I'm the only agent in the whole world *responsible* for Angela's condition, no (emphasis added).

Appellant argues that the plain meaning of Dr. Waterhouse's statement is, "I am not the only agent who caused and is accountable for Angela's condition and that there are others who caused and are accountable for her condition as well." In other words, appellant argues that Dr. Waterhouse, by the above colloquy, admitted that he was at fault. We disagree.

Dr. Waterhouse attempts to clarify his statement later in the trial:

Q. [attorney for plaintiff/appellant] So when you stated last Thursday under oath in front of these folks right here, and I'm quoting you, "Well, just to cut to the chase, Mr. Grissom, I'm the only one sitting here, and I certainly don't believe that I'm the only agent in the whole world responsible for Angela's condition," do you remember saying that?

A. [Dr. Waterhouse] Yes, sir, I said that.

Q. And by that, you want this jury to believe that you're saying no one is responsible?

A. Well, I am sitting here today and no one else is on trial.

Q. My question to you, sir, is when you made this statement wherein you said "I don't believe I'm the only agent in the whole world responsible for Angela's condition," were you implying you share in the degree of responsibility for Angela's condition, or were you saying no one was at fault?

A. Well, it wasn't really saying either one to be honest.

\* \* \* \* \* \*

Q. Back to the statement that you made yesterday about being, that you didn't think that you were the only one here, that

you certainly didn't believe that I'm the only agent in the whole world responsible for Angela. When you made that statement, what were you saying as to responsibilities?

A. What was I saying as to responsibility?

Q. Yes, sir. You said "I certainly don't believe that I'm the only agent in the whole world responsible for Angela's condition." When you used the term "responsible for Angela's condition," what were you trying to tell the jury when you used that?

A. My thinking was that it's an extremely complex case where a child had a post-operative problem. Many doctors were involved, the patients were involved. There was a period of time when she was sick before she came to the hospital, and she came to the hospital and the people at the hospital did the best that they could to take care of her and the result is tragic. *That's not to say that any one of those people is responsible for it.*

\* \* \* \* \* \*

Q. My question to you, sir, is, you said no one person was responsible and you've just commented that given the complexities of this case, given the number of physicians involved, you don't believe any one person is responsible. What I'm curious is, do you have an opinion as to if more than one person or persons were responsible [for Angela's condition on May 28, 1980 that led to what her current condition is today]?

\* \* \* \* \* \*

A. I think Angela had an urgent medical condition of May the 28th.

\* \* \* \* \* \*

Q. My question to you, sir, is, do you have any knowledge, you said no one person, do you have any knowledge whether person or persons from 2:55 until 4:16 [when Angela was in extremis] share in any of the responsibility for Angela's condition at that time of day?

A. I do not think that—I don't think that—Well, again, you know, *I don't think that either I or the people in the hospital are responsible for Angela's condition.*

Q. *Your testimony today is that you're not responsible and neither is anyone at the hospital, correct?*

A. *That's correct* (emphasis added).

■ The record reflects that Dr. Waterhouse did not admit fault and clearly was not admitting legal liability. In fact, his testimony indicates that he did not believe that any of the doctors at Children's Mercy, including himself, were legally responsible or liable for Angela's injuries. The trial court did not err in not directing the verdict for Angela on the issue of liability.

Appellant's second point is denied.

### III.

In her third point on appeal, Angela argues as follows:

> THE TRIAL COURT ERRED IN REFUSING TO GRANT PLAINTIFF'S MOTION FOR JUDGMENT NOT WITHSTANDING THE VERDICT ON THE ISSUE OF LIABILITY BECAUSE THE ONLY COMPETENT EVIDENCE REGARDING THE NEGLIGENCE AND FAULT OF DRS. BANDY, ASHCRAFT, HOLDER, AND RAJAN IN THAT THE ONLY EXPERT TESTIMONY ON THAT ISSUE WAS BY PLAINTIFF'S LIABILITY EXPERT, FRANK BAKER, M.D. AND DEFENDANT'S JUDICIAL ADMISSIONS.

■ This argument does not comply with Rule 84.04(d). Rule 84.04(d) provides, in relevant part, as follows:

> **(d) Points Relied On.** The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous, with citations of authorities thereunder. . . .
>
> Setting out only abstract statements of law without showing how they are related to any action or ruling of the court is not a compliance with this Rule.

The three requisite components of a point relied on are (1) a concise statement of the challenged ruling of the trial court, (2) the

rule of law which the court should have applied, and (3) the evidentiary basis upon which the asserted rule is applicable. *Straeter Distributing v. Fry–Wagner Moving & Storage Co.*, 862 S.W.2d 415, 417 (Mo.App. 1993). Appellate courts have no obligation to review points which are not in conformity with the rules. *Id.*

█ Appellant's third point relied does not comply with Rule 84.04(d) because it fails to state the rule of law appellant contends the trial court should have applied and further fails to state how the evidence cited supports such a rule of law. Appellant's third point is confusing at best, and is denied.

## IV.—VII.

Appellant's points four through seven on appeal concern various allegations of reversible error in closing argument and the trial court's failure to grant appellant a new trial based on these alleged errors.

In her fourth point, Angela argues that the trial court erred by failing to grant her a new trial because defense counsel committed reversible error in closing argument to the jury in that counsel argued about Angela's non-production of evidence (past medical bills) that was equally available to the parties and that defense counsel sought to exclude.

█ In closing argument, counsel is afforded wide latitude to suggest inferences from the evidence and the trial court similarly has broad discretion to determine if a particular line of argument is proper. *Carter v. Liberty Equip. Co.*, 611 S.W.2d 311, 315 (Mo.App.1980). In the exercise of its discretion, the trial court is in the best position to appraise the consequence of argument and the appellate court may intervene only if it concludes that the trial court abused that discretion. *Id.*

The initial petition herein included a count by Angela's mother, Deneise Bird, requesting damages for past medical and other expenses. An amended petition was filed in which Angela requested damages for past medical and other expenses as well as other damages. The amended petition did not include a separate count by Angela's mother for damages. Subsequent to the filing of the amended petition, and before trial, Angela's mother filed a dismissal of her "cause of action asserted against" Dr. Waterhouse.[7] After the dismissal, Dr. Waterhouse filed his Motion for Partial Summary Judgment on Angela's claim for damages related to past medical expenses incurred during Angela's minority. On February 4, 1992, the trial court denied Dr. Waterhouse's motion.

At trial, the issue of past medical expenses was only introduced during defense counsel's cross-examination of appellant's life care expert, Dr. Robert Voogt, a rehabilitation specialist:

Q. [defense counsel] Okay. Have you looked at any of the receipts or bills from any of the equipment that's been purchased for Angela in the past?

A. No.

MR. GRISSOM [counsel for plaintiff/appellant]: Your Honor, I object. That's getting into past damages, and we haven't made a claim for past damages in this case as to collecting a loss.

MS. RAWLINS [defense counsel]: Your Honor, I think it goes to his credibility about his numbers.

THE COURT: Counselor, he said he didn't do it anyway. He didn't look at it.

The portion of defense counsel's closing argument about which appellant complains in this point is as follows:

And you'll recall I asked [Dr. Voogt] if he'd seen the medical bills in the case to see what had actually been spent on Angela, which is the best evidence of what's actually needed for somebody, being what's actually been spent in the last 14 years.

At this point, counsel for Angela objected, stating:

I don't believe there was any testimony to the doctor about any past medical claims.

---

7. It does not appear that Deneise Bird stated a cause of action on her behalf individually in the amended petition.

We have no past medical claims that we're seeking in this case.

Defense counsel responded:

I'm not going to past medical claims, Your Honor. I'm arguing about the future medical claims he's put up here on the board, the fact that he didn't have a foundation for that.

■ We find that the statement made during closing argument referring to testimony elicited by appellant's expert was properly allowed. On cross-examination of Dr. Voogt, defense counsel was merely inquiring whether Dr. Voogt had considered past medical expenses in connection with his prediction of future expenses. The issue of whether Dr. Voogt had reviewed and considered Angela's past medical bills in preparing a "life care plan" for Angela which projected, in part, future damages for medical care is relevant to impeach the validity of the "life care plan." Dr. Voogt's testimony on cross-examination, which revealed that he had not reviewed Angela's past medical bills, was properly admitted and, thus, reference to Dr. Voogt's testimony in this regard was proper during closing argument.

Appellant's fourth point is denied.

In her fifth point on appeal, Angela argues that the trial court erred by failing to grant her a new trial because defense counsel committed reversible error in closing argument to the jury in that counsel improperly stated the law by implying to the jury that Angela could still recover from other parties.

Before addressing the merits of this point, we note that Angela's counsel failed to object to this argument by defense counsel. Appellant argues in her brief that she "had already made an objection to the improper argument of counsel and was attempting to avoid further objections." Appellant's argument, however, is misleading. The objection that appellant's counsel made was in regard to testimony about past medical claims (discussed above in appellant's fourth point), was made well before defense counsel's argument set forth in this point, and did not relate to the argument complained of in this point.

■ The rule in Missouri is that when a party has duly objected to a certain type of evidence and the objection has been overruled, he need not repeat the objection to further evidence *of the same type* in order to preserve the objection. *State ex rel. State Highway Comm'n v. Offutt*, 488 S.W.2d 656, 661 (Mo.1972). Any alleged improper argument is to be reviewed only as plain error if plaintiff did not object to the argument of defense counsel during trial. *Robertson v. Cameron Mut. Ins. Co.*, 855 S.W.2d 442, 447 (Mo.App.1993). The plain error rule, which is rarely applied in civil cases, is reserved for situations where a manifest injustice or miscarriage of justice has occurred. *Id.*

■ In the case at bar, appellant has failed to preserve this argument for review in that appellant's counsel failed to object to this allegedly improper argument of defense counsel. However, we will review this point for plain error.

■ The permissible field of argument is broad and as long as counsel does not go beyond the evidence and issues drawn by the instructions or urge prejudicial matters or claim or defense which the evidence and issues do not justify, counsel is permitted wide latitude in his comments. *Hagedorn v. Adams*, 854 S.W.2d 470, 478 (Mo.App.1993). As stated above, the trial court has broad discretion in the area of closing arguments, and such discretion is not lightly to be disturbed on appeal. *Midwest Materials Co. v. Village Dev. Co.*, 806 S.W.2d 477, 492 (Mo. App.1991). Furthermore, the law indulges a liberal attitude toward closing argument, particularly where the comment complained of is a fair retort or responds to prior argument of opposing counsel. *Kelly by Kelly v. Jackson*, 798 S.W.2d 699, 704 (Mo. banc 1990).

In her brief, Angela argues as follows:

Defense counsel improperly misstated [sic] the law by stating that this trial was Plaintiff's only chance of recovery against Dr. Waterhouse, implying that Plaintiff could pursue other parties in separate trials. This argument further improperly implied that there were other defendants. Counsel argued:

". . . If you're going to blame him, somebody else is responsible as well.

Mr. Grissom [counsel for plaintiff/appellant] just got up here and said, gosh, this is Angela's only chance. **Well, that's just not true,** ladies and gentlemen. This is her chance against George Waterhouse."

Angela argues that the court failed to take action to purge defense counsel's argument and as a result the jury considered matters outside the evidence, depriving Angela of a fair trial.

■ Respondent correctly points out that Angela's counsel opened the door on this issue in his closing argument when he stated as follows:

Angela comes before you because, ladies and gentlemen, you are her last hope. There is no where else to go except back home to Olathe. *We don't get another shot,* we don't get to come in here in 10 or 15 years and say, gee, you made that award of money, now we're out. This is it (emphasis added).

This argument could lead the jury to believe that Angela had no other recourse. In reality, however, Angela settled with other defendants. Defense counsel was entitled to respond to this potentially misleading representation by Angela's counsel, and defense counsel's comments were appropriate. Furthermore, defense counsel did not misstate the law. The trial court did not abuse its discretion in allowing this retort to Angela's attorney's argument. There was no error, plain or otherwise.

Appellant's fifth point is denied.

In her sixth point on appeal, Angela argues that the trial court erred by failing to grant her a new trial because defense counsel committed reversible error in closing argument to the jury in that counsel improperly argued that other defendants were involved, implying prior settlements.

Specifically, Angela refers to the following portions of defense counsel's argument:

If you're going to blame [Dr. Waterhouse], *somebody else is responsible as well.*

Mr. Grissom [counsel for plaintiff/appellant] just got up here and said, gosh, this is

Angela's only chance. Well, that's just not true, ladies and gentlemen. This is her chance against George Waterhouse. Then he said as he read that instruction, if I wrote it down correctly, if you find against one, then they're all liable. *I don't see anyone else here.* What they're saying is he's liable for everybody else. I don't think that's what you're going to find.

\*　　\*　　\*　　\*　　\*　　\*

It's a tragedy that this man was hung out to dry on this case. *It's a tragedy that he's the only one here being blamed for this* (emphasis added).

We note that Angela's counsel did not object to these allegedly inappropriate comments of defense counsel. As stated in Angela's fifth point, this argument is not preserved for review. However, we will review for plain error.

■ Defense counsel's argument here merely responded to Angela's theory of vicarious liability for "concerted action" and attempted to persuade the jury that Dr. Waterhouse should not be liable for someone else's alleged fault. Contrary to Angela's assertion, the argument was not an improper attempt to inject the settlements that Angela had reached with other defendants.

There was no error, plain or otherwise, and the trial court did not abuse its discretion in allowing this argument.

Appellant's sixth point is denied.

In her seventh point on appeal, Angela argues that the trial court erred by failing to grant her a new trial because defense counsel committed reversible error in closing argument to the jury in that counsel improperly stated the law implying that the jury instructions were plaintiff's instructions thereby minimizing their importance to the jury.

The specific portion of defense counsel's closing argument about which Angela complains reads as follows:

One of *their* instructions, one of the claims they've made in this case is that Dr. Waterhouse should be responsible for Dr. Rajan and Dr. Bandy. If they were supposed to do something, then that's Dr. Water-

house's fault. This instruction is going to say you have to find all those people were in—

At this point, Angela's attorney made the following objection:

> Your Honor, I apologize for interrupting, but I would like to make an objection. I think the jury needs to know those are the instructions from the Court. They are not my instructions, nor are they [defense counsel's] instructions, they're the instructions from the Court.

Defense counsel then responded:

> *I stand corrected, Counselor. They are the Court's instructions, ladies and gentlemen* (emphasis added) . . .

 Defense counsel's argument was not prejudicial as she immediately corrected herself upon Angela's attorney's objection. It is apparent from the record that defense counsel misspoke in stating that the instructions were the plaintiff's. Any alleged error was immediately corrected.

Defense counsel did not commit reversible error by the above argument.

Appellant's seventh point is denied.

### VIII.

In her final point on appeal, Angela argues that the trial court erred in not allowing Angela's treating physicians, who were not designated as expert witnesses, to give opinion evidence because a party is not required to designate treating physicians as expert witnesses pursuant to Rule 56.01(b)(4). Angela contends that her treating physicians were not hired for the purposes of litigation and do not fall within the scope of Rule 56.01(b)(4).[8]

---

8. Rule 56.01(b)(4) provides as follows:

> **(b) Scope of discovery.** Unless otherwise limited by order of the Court in accordance with these rules, the scope of discovery is as follows:
>
> \* \* \* \* \* \*
>
> (4) *Trial preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of Rule 56.01(b)(1) and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
>
> (a) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial by providing such ex-

 We need not address the merits of this argument, as respondent correctly points out in his brief that any error by the trial court with respect to the exclusion of testimony by Dr. Craemer and Dr. Asher, Angela's treating physicians, was harmless since the testimony of both of these witnesses related to damages, an issue that was never reached by this jury. Any error would therefore not be prejudicial. *Riney v. Zenith Radio Corp.*, 668 S.W.2d 610, 611 (Mo. App.1984).

Point denied.

The trial court's judgment in favor of Dr. Waterhouse is affirmed.

All concur.

pert's name, address, occupation, place of employment and qualifications to give an opinion, or if such information is available on the expert's curriculum vitae, such curriculum vitae may be attached to the interrogatory answers as a full response to such interrogatory, and to state the general nature of the subject matter on which the expert is expected to testify, and the expert's hourly deposition fee.

(b) A party may discover by deposition the facts and opinions to which the expert is expected to testify. Unless manifest injustice would result, the court shall require that the party seeking discovery from an expert pay the expert a reasonable hourly fee for the time such expert is deposed.