Susan DELACROIX, et al., Respondents/Cross–Appellants,

v.

DONCASTERS, INC., Appellant/Cross–Respondent.

No. ED 97375.

Missouri Court of Appeals, Eastern District, En Banc.

May 7, 2013.

Application for Transfer to Supreme Court Denied June 18, 2013.

Application for Transfer Denied Aug. 13, 2013.

Edward L. Dowd, Jr., James F. Bennett, Terrence J. O'Toole, Selena E. Gillham, Saint Louis, MO, for Appellants.

Gary C. Robb, Anita Porte Robb, Kansas City, MO, for Respondents/Cross–Appellants, Delacrois, Cook, Bachand, Berridge, Walsh & Cowan.

Randy W. James, Lee's Summit, MO, for Respondent/Cross–Appellant, Cowan.

Gary R. Sarachan, Saint Louis, MO, for Respondent/Cross–Appellant, Walsh.

## OPINION

### GLENN A. NORTON, J.

Doncasters, Inc. ("Doncasters") appeals the judgment entered upon jury verdicts awarding Plaintiff Susan Delacroix $4 million for the wrongful death of Victoria Delacroix, Plaintiff Barbara Berridge $4 million for the wrongful death of Melissa Berridge, Plaintiffs Mark Cook and Annette Bachand $4 million for the wrongful death of Robert Cook, Plaintiff Joan Walsh $4 million for the wrongful death of Robert Walsh, and Plaintiff James Cowan $4 million for the wrongful death of Scott Cowan.[1] Plaintiffs cross-appeal the trial court's grant of judgment notwithstanding the verdict in favor of Doncasters after the jury returned a verdict awarding Plaintiffs a collective $28 million in punitive damages, resulting in $5.6 million in punitive damages for each wrongful death claim.[2] We affirm in part and reverse and remand in part.

## I. BACKGROUND

This appeal involves claims for wrongful death after the crash of a DHC–6 Twin Otter airplane ("Twin Otter") owned by Adventure Aviation for use in skydiving expeditions operated by Quantum Leap.[3] The Twin Otter was equipped with a model PT6A–20 engine manufactured by Pratt & Whitney Canada ("PWC"). PWC equipped the engine with compressor turbine blades ("CT-blades") manufactured with a pack-aluminide coating and the base metal alloy Inconel–713 to prevent oxidation. Prior to Adventure Aviation's ownership of the Twin Otter, the engine's CT-blades were replaced with CT-blades manufactured by Doncasters.[4] The replace-

---

1. Susan Delacroix, Barbara Berridge, Mark Cook, Annette Bachand, Joan Walsh, and James Cowan will be referred to collectively as "Plaintiffs." The decedents will be referred to collectively as "Decedents."

2. The jury returned a single punitive damages verdict awarding Plaintiffs a collective $28 million. The trial court then allocated $5.6 million in punitive damages to each wrongful death claim.

3. Third-party claims brought by Doncasters against Adventure Aviation and Quantum Leap remain pending but are not the subject of this appeal. The trial court entered an order certifying the judgment at issue here as final and appealable.

4. The CT-blades were originally designed and manufactured by Turbo Products, a company later acquired by Doncasters.

ment CT-blades were manufactured with a different coating, SermaLoy J, and a different base metal alloy, Inconel–738, than the original coating and metal alloy used by PWC in the manufacture of the original CT-blades.

On July 29, 2006, Victoria Delacroix, Melissa Berridge, Robert Cook, Robert Walsh, and the pilot, Scott Cowan (collectively "Decedents") boarded the Twin Otter for a skydiving expedition. Shortly after take-off, the right engine failed and the Twin Otter crashed. With the exception of Victoria Delacroix, who survived for three days following the accident, Decedents died upon impact. Plaintiffs, Decedents' parents, filed strict products liability claims against Doncasters for the wrongful death of Decedents, alleging that the replacement CT-blades manufactured by Doncasters[5] were defective and caused Decedents' deaths.[6] Plaintiffs' claims were consolidated, and the cause proceeded to trial. As part of a discovery sanction against Doncasters, the trial court bifurcated the trial into two phases where the jury would consider compensatory liability and damages in the first phase and punitive liability and damages in the second phase.

During the first phase of the trial, Plaintiffs introduced evidence that the use of SermaLoy J and Inconel–738 in the manufacture of the CT-blades rendered the CT-blades defective, resulting in the Twin Otter's engine failure and the subsequent deaths of Decedents. Specifically, Plaintiffs' experts testified that the SermaLoy J coating was prone to cracking and the Inconel–738 base metal alloy had low oxi-

dation resistance. The experts opined that the SermaLoy J coating cracked, providing a pathway for the oxidation of the Inconel–738 metal alloy. This process eventually led to the fracture of a single CT-blade and resulted in the engine failure and subsequent crash of the Twin Otter. Based on this evidence, the jury returned verdicts finding Doncasters liable for the deaths of Decedents and awarding Plaintiffs a collective $20 million in compensatory damages, $4 million for each wrongful death claim.

During the second phase of the trial, Plaintiffs introduced evidence that the CT-blades failed testing and Federal Aviation Administration certification requirements prior to their manufacture and sale. Based on this evidence, the Franklin County jury returned a verdict after the second phase of the trial, awarding Plaintiffs a collective $28 million in punitive damages.

The trial court entered judgment in accordance with the jury's compensatory and punitive damages verdicts and allocated the $28 million punitive damages verdict so that each wrongful death claim would recover $5.6 million in punitive damages. Doncasters filed motions for judgment notwithstanding the verdicts and alternative motions for remittitur, reduction of the judgment, and new trial. The trial court granted the motion for judgment notwithstanding the verdict as to the verdict awarding Plaintiffs punitive damages and denied all remaining motions. Doncasters appeals and Plaintiffs cross-appeal.

---

5. Unless otherwise indicated, all future references to CT-blades are to the blades manufactured by Doncasters.

6. Plaintiffs' wrongful death actions also relied on a negligence theory of liability. However, Plaintiffs dismissed their negligence claims prior to trial, leaving only Plaintiffs' strict products liability claims. Plaintiffs also brought claims against additional parties. Those claims were voluntarily dismissed and are not the subject of this appeal.

## II. DISCUSSION

### A. Doncasters' Appeal

Doncasters asserts nine points on appeal, claiming the trial court committed multiple errors during the first phase of the trial and in entering judgment in accordance with the jury's compensatory damages verdicts.

### 1. Compensatory Damages Instruction

 In its first point on appeal, Doncasters claims the trial court erred in instructing the jury with the following compensatory damages instruction, modeled after Missouri Approved Instruction 5.01 (6th ed.2002): [7]

> If you find in favor of [Plaintiff], then you must award [P]laintiff such sum as you believe will fairly and justly compensate [P]laintiff for any damages you believe [P]laintiff *and [D]ecedent* sustained and [P]laintiff is reasonably certain to sustain in the future as a direct result of the fatal injury to [Decedent].

(emphasis added).[8] The issue of whether a jury was properly instructed is a question of law that we review de novo. *Fleshner v. Pepose Vision Institute, P.C.*, 304 S.W.3d 81, 90 (Mo. banc 2010). We will reverse only if the jury was misled, misdirected, or confused by the submitted jury instruction and prejudice resulted. *Id.* at 90–91.

 Doncasters asserts that the compensatory damages instruction was erroneous because section 537.090 RSMo 2000 [9] and the Notes on Use to MAI 5.01 only allow a plaintiff to recover damages sustained by a decedent if the decedent sustained pain and suffering between the time of injury and the time of death. Because Decedents, with the exception of Victoria Delacroix, died immediately upon impact, Doncasters contends that, with the exception of Victoria Delacroix, it was erroneous to instruct the jury to compensate Plaintiffs for pain and suffering sustained by Decedents. We disagree.

Section 537.090 states that "the trier of the facts may award such damages as the deceased may have suffered between the time of injury and the time of death and for the recovery of which the deceased might have maintained an action had death not ensued." "The quoted language [of section 537.090] *fully* covers *any* pain, suffering and other compensatory damages the deceased may have experienced *prior to death.*" *Bennett v. Owens–Corning Fiberglas Corp.*, 896 S.W.2d 464, 466 (Mo. banc 1995) (emphasis added). The Notes on Use to MAI 5.01 advise the trial court to instruct the jury to compensate a plaintiff for any damages sustained by a decedent "where the evidence supports the submission of damages to decedent between the time of injury and time of death, i.e. pain and suffering."

Here, substantial evidence was introduced to show that Decedents suffered from pre-impact terror prior to the crash of the Twin Otter. Dr. Carlos Diaz testified for Plaintiffs and described pre-impact terror as a set of sensations, feelings, and emotions a person experiences when that person feels that death is imminent. Dr. Diaz opined that Decedents experienced "horrific" pre-impact terror for fifty-two seconds prior to the crash. Doncasters contends that it was erroneous to allow the jury to consider these pre-impact damages

---

7. All references to MAI are to Missouri Approved Instructions (6th ed.2002).

8. The trial court used this instruction for each individual wrongful death claim.

9. Unless otherwise indicated, all statutory references are to RSMo 2000.

because any pre-impact terror was sustained by Decedents prior to their injuries, which Doncasters contends occurred at the impact of the crash.

This Court has held that pre-impact terror experienced by a decedent prior to an impending aircraft crash is compensable in a wrongful death action under section 537.090. *Blum v. Airport Terminal Services, Inc.*, 762 S.W.2d 67, 76 (Mo.App. E.D.1988). In reviewing whether the plaintiffs' verdict was grossly excessive, the *Blum* Court stated that a plaintiff can recover pain and suffering experienced by the decedent prior to his death. *Id.* at 75. In upholding the jury's verdict, the Court found that the decedent pilot "unquestionably sustained severe pain and suffering during his conscious moments" and allowed recovery of the decedent's "pre-impact awareness of the impending disaster." *Id.* at 69, 76.

■■■ Moreover, section 537.090 is a remedial statute that must be applied to promote the object of the legislative enactment. *O'Grady v. Brown*, 654 S.W.2d 904, 907–08 (Mo. banc 1983). Remedial statutes are construed broadly and liberally to effect the statute's plain purpose. *Hudson v. State Security Ins. Co.*, 555 S.W.2d 859, 861 (Mo.App.1977). Ensuring that tortfeasors pay for the consequences of their actions has been identified as one purpose of a wrongful death action filed under Chapter 537. *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 765 (Mo.App. W.D.2008). In line with this purpose, we decline to construe section 537.090 to disallow recovery of damages for pain and suffering that were determined to be the direct result of Doncasters' actions merely because that pain and suffering occurred prior to the impact of the crash. *See Solomon v. Warren*, 540 F.2d 777, 793 (5th Cir.1976) (stating that although the "usual sequence is impact

followed by pain and suffering, we are unable to discern any reason based on either law or logic for rejecting a claim because in this case as to at least part of the suffering, this sequence was reversed").

Although section 537.090 limits the recovery of a decedent's damages to that occurring between the time of injury and the time of death, in this case, there was substantial evidence that Decedents' injuries occurred prior to the impact of the crash, at the time the right engine failed. Accordingly, Decedents' pre-impact terror could be recoverable by Plaintiffs as "damages ... the deceased may have suffered between the time of injury and the time of death." Section 537.090. The trial court did not err in so instructing the jury. Point one is denied.

### 2. Motion for Mistrial

■■■ In its second point on appeal, Doncasters claims that the trial court erred in denying its motion for mistrial after Plaintiffs, in violation of the trial court's ruling, introduced evidence of other incidents that were not substantially similar to Plaintiffs' theory of the Twin Otter crash. We disagree.

■■■ A mistrial is a drastic remedy that should be granted only in exceptional circumstances. *Campise v. Borcherding*, 224 S.W.3d 91, 94 (Mo.App. E.D.2007). The decision to grant a mistrial is largely within the discretion of the trial court, and we will reverse a denial of a motion for mistrial only when there has been a manifest abuse of discretion. *Brown v. Bailey*, 210 S.W.3d 397, 411 (Mo.App. E.D.2006). A manifest abuse of discretion occurs only when the error is so grievous that prejudice cannot be removed. *Id.* "The trial court is in a better position to assess the prejudicial effect of improper evidence on the jury and to evaluate whether any re-

sulting prejudice can be cured by less drastic means than granting a mistrial." *Id.*

Here, Plaintiffs sought to introduce evidence of twenty-six incidents as being substantially similar to the Twin Otter crash at issue in this case. After hearing testimony outside the presence of the jury, the trial court excluded any evidence of the other incidents, finding that "[n]one of the incidents put forth by the Plaintiffs as being substantially similar have been shown to have been caused by the same causal mechanism that [Plaintiffs' expert] has found in this case." During the cross-examination of Doncasters' expert, with the jury present, counsel for Plaintiff James Cowan, Randy James, asked the following question:

Q: But what you do know, sir, from your reading of the materials, particularly the deposition of Mr. Woodrow Estabrook who appeared as the corporate representative for Doncasters in this case, is that Doncasters knows that this happens (indicating). They have reports of it—

[Counsel for Doncasters]: Objection, Your Honor—

Q: And—and—

[Counsel for Doncasters]: Move to strike, Your Honor.

Q: They know that it will result—

The Court: Mr. James.

Q:—in a catastrophic—

The Court: Mr. James.

Q:—dangerous situation.

The Court: Mr. James, there's an objection.

Doncasters argued the question was in violation of the trial court's ruling excluding evidence of other incidents. The trial court agreed, finding that the question dealt with substantially similar circumstances and was not appropriate. Doncasters moved for a mistrial, and the jury was dismissed for the day while counsel continued to argue the motion to the trial court. The following morning, the trial court denied the motion for mistrial and issued a curative instruction for the jury to disregard counsel's question. In doing so, the trial court expressly found that it believed the instruction "cures the harm." On appeal, Doncasters claims the curative instruction was insufficient to cure the consequences of the improper questioning, citing *City of Springfield v. Thompson Sales Co.*, 71 S.W.3d 597 (Mo. banc 2002).

*City of Springfield* involved a condemnation action to determine the value of property owned by a business that was condemned for use as a city park. *Id.* at 598. During voir dire, the City improperly referenced the burden a verdict might impose on taxpayers. *Id.* at 599–600. After its motion for mistrial was denied, the business appealed arguing that the prejudicial effect of the improper comment warranted a mistrial. *Id.* On appeal, the City recognized the impropriety of the comments but argued that any prejudice was cured when the judge promptly sustained the objection and offered remedies short of a mistrial *Id.* at 600–01. The Court disagreed, finding that a mistrial was warranted where the effect of the error was compounded by other improper and prejudicial comments made in violation of a ruling *in limine* and where the trial court never admonished the jury to disregard the improper comment. *Id.* at 601. Accordingly, the Court reversed the case for a new trial, finding that the prejudice "could not be cured by a mere sustaining of the ... objection." *Id.*

Unlike *City of Springfield,* we find that any prejudice that may have resulted from the alleged violation of the trial court's

ruling was cured by the trial court.[10] Here, the basis for the motion for mistrial occurred in a single question that did not directly reference another incident, and, contrary to *City of Springfield*, the question was not compounded by other improper and prejudicial comments. Furthermore, the trial court here did more than merely sustain an objection. Instead, the trial court issued a curative instruction to the jury to disregard the question from counsel. This instruction was given to the jury the morning immediately following the challenged question, while the question was fresh in the jury's mind. We must presume that the jury will follow the trial court's instructions. *Bailey*, 210 S.W.3d at 412. Moreover, the trial court explicitly found that it believed the curative instruction cured the harm. *See id.* (finding that the trial court's denial of a mistrial did not constitute a manifest abuse of discretion where "the trial court effectively determined that any prejudice from the improper elicitation of evidence could be cured by less drastic means than granting a mistrial"). Under these circumstances, and in light of the superior position of the trial court to assess any prejudicial effect of the allegedly improper question, we cannot find that the denial of Doncasters' motion for mistrial constituted a manifest abuse of discretion. Point two is denied.

### 3. Motions for Directed Verdicts and Judgment Notwithstanding the Verdicts

In Doncasters' third point on appeal, it argues that the trial court erred in denying its motions for directed verdicts and judgment notwithstanding the verdicts as to compensatory damages because there was no substantial evidence that the CT-blades were defective and caused Plaintiffs' injuries. We disagree.

 Our review is limited to a determination of whether Plaintiffs made a submissible case. *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010). In order to make a submissible case, each element of a plaintiff's claim must be supported by substantial evidence. *Id.* In reviewing whether a case was submissible, this Court considers the evidence and all reasonable inferences drawn therefrom in the light most favorable to the plaintiff and disregards all contrary evidence and inferences. *Id.* "The jury's verdict will be reversed only if there is a complete absence of probative facts to support the jury's conclusion." *Id.*

In order to prevail on their strict products liability claims, Plaintiffs had to prove the following necessary elements: (1) Doncasters sold the CT-blades in the course of its business; (2) the CT-blades were then in a defective condition, unreasonably dangerous when put to a reasonably anticipated use; (3) the CT-blades were used in a manner reasonably anticipated; and (4) Plaintiffs were damaged as a direct result of the defective condition that existed when the CT-blades were sold. *Engel v. Corrigan Company–Mechanical Contractors, Inc., A Division of Corrigan Brothers, Inc.*, 148 S.W.3d 28, 30 (Mo.App. E.D. 2004); section 537.760. Doncasters does not dispute the first and third elements and argues only that there was no substantial evidence that the accident was caused by a defect in the CT-blades that existed at the time they were sold.

---

10. Plaintiffs maintain that counsel's question was proper cross-examination that did not violate the trial court's ruling. Because we find that any prejudice resulting from the allegedly improper question was cured by the trial court, we need not address the issue of whether counsel's question improperly referenced other incidents in violation of the trial court's ruling.

### a. Substantial Evidence of Defective Condition of CT-blades

■ Plaintiffs rely on expert testimony to argue that they presented submissible strict products liability claims based on a defective design of Doncasters' CT-blades. Plaintiffs' aircraft engine design expert, Dr. David Hoeppner, and Plaintiffs' metallurgical expert, Dr. Richard McSwain, testified that Doncasters' CT-blades were in a defective condition unreasonably dangerous for use in the Twin Otter because the material used in the manufacture of the CT-blades, SermaLoy J and Inconel–738, did not satisfy the specific design criteria of the original manufacturer. Dr. McSwain opined that the SermaLoy J coating was prone to cracking which provided a pathway for the oxidation of the underlying Inconel–738 alloy, which was more prone to high temperature oxidation than the alloy specified by PWC. The testimony of Dr. Hoeppner and Dr. McSwain constitutes substantial evidence from which a reasonable juror could find that the CT-blades were in a defective condition at the time they were sold.

### b. Substantial Evidence of Causation

■ Plaintiffs' accident reconstruction expert, Jack Lipscomb, testified that the cause of the crash was the failure of the right engine at a critical point in the flight. Testimony from Dr. Hoeppner and Dr. McSwain supports a finding that the Twin Otter crash, and Decedents' resulting deaths, was a direct result of the defective condition of the CT-blades. Dr. Hoeppner gave the following testimony:

Q: Doctor, do you have an opinion to a reasonable degree of engineering certainty whether as a direct result of the defective condition as existed when the Doncasters['] compressor CT blades were sold the right engine of the Twin Otter airplane failed and the airplane crashed? Do you have such an opinion?

A: Yes.

Q: Please share it with us.

A: Well, the blade fractured and at that point the engine ceased working and the result is history. But it all started with the blade fracture.

Dr. McSwain studied the CT-blades recovered from the right engine of the Twin Otter and opined that Doncasters' defective design of the CT-blades allowed oxidation of the CT-blades that led to the Twin Otter crash:

Q: Do you have an opinion to a reasonable degree of certainty, Dr. McSwain, as to whether there was oxidation in the base metal of the CT blades that were in the right engine of this Twin Otter on July 29, 2006, that were prior to the crash?

. . .

A: Yes, definitely. There was oxidation in the cracks in the base metal . . . prior to the crash.

Q: And the significance of that, Doctor?

A: It's exactly what happens with this coating. The coating cracks and exposes this [Inconel]–738 to the atmosphere. It oxidizes and it cracks.

Q: Is this precisely the type of oxidation that you would expect from the—from a brittleness or cracking of the SermaLoy J coating on this type of aircraft part?

A: Yes.

. . .

Q: Dr. McSwain, having considered all of the work that you have done in this case, and applying to all of that work the experience and the training and the education in your field

of expertise, are you prepared to state your opinion to this jury as to the root cause of engine failure of that engine on July 29, 2006?

. . .

A: The root cause, from all that work, was the SermaLoy J coating cracking, which provided a pathway for the environment to the base metal, the [Inconel]–738, which has lower oxidation resistance.

That material then oxidized, developed cracks. Those cracks progressed to the point that there was one blade separation. That blade separation then caused the other blades to be broken and damaged and lost.

. . .

Q: Doctor, do you have an opinion . . . as to whether or not the Doncasters compressor turbine blades made out of [Inconel]–738 with the SermaLoy J coating were suitable for use in the PT6A–20 engines on this aircraft?

. . .

A: That that material combination was not suitable.

Q: And do you have an opinion then as to whether or not, given what we know happened in this case and your opinion about the root cause, as to whether or not the Doncasters['] compressor turbine blades were defective?

A: In this application, yes.

Q: And in your opinion, did that defect directly cause the engine failure that resulted in the crash and the deaths of all of these people?

A: Yes.

Doncasters contends that the evidence of oxidation found by Dr. McSwain in the CT-blades could have taken place in the high-temperature environment after the right engine failed but before the crash occurred. Therefore, Doncasters asserts that Dr. McSwain's testimony that oxidation of the CT-blades caused the engine failure was based solely on speculation. However, after his theory was challenged by Doncasters on cross-examination, Dr. McSwain gave the following testimony on redirect:

Q: Dr. McSwain, I want to clarify something so that we are absolutely clear as to what oxide was and was not present before and after the crash. Did you, sir, see that there was evidence of oxide that would have been in the blade *prior to the engine failure?*

A: Yes.

Q: Any question about that, Dr. McSwain?

A: None at all.

Q: On a scale from one to ten, with ten being the firmest of convictions, would you tell this jury the strength of your confidence in that opinion?

A: It's a ten.

(emphasis added).

The testimony set forth above constitutes substantial evidence from which a reasonable juror could find that the defective condition of the CT-blades allowed cracking and oxidation of the CT-blades which ultimately led to the failure of the right engine and the subsequent crash. Accordingly, there was substantial evidence to support a finding that Plaintiffs' injuries were the direct result of the defective condition of Doncasters' CT-blades.

c. **Conclusion**

Plaintiffs introduced substantial evidence that a defect at the time the CT-blades were sold caused the accident. Accordingly, the trial court did not err in denying Doncasters' motions for directed

verdicts and judgment notwithstanding the verdicts. Point three is denied.

### 4. Evidence of Other Parties' Fault

In its fourth point on appeal, Doncasters asserts that the trial court erred in excluding evidence that the fault of other parties combined to be the sole cause of the accident. We disagree.

A trial court's ruling on the admission or exclusion of evidence is reviewed for an abuse of discretion. *Teasdale & Associates v. Richmond Heights Church of God in Christ*, 373 S.W.3d 17, 21 (Mo.App. E.D.2012). "A trial court abuses its discretion when it makes a ruling that is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id.* (internal quotation omitted). Furthermore, even if the trial court abused its discretion, we will only reverse if the error was so prejudicial that Doncasters was deprived of a fair trial. *Id.*

Doncasters' theory of the Twin Otter crash was that the engine failure was caused by the CT-blades coming in contact with another portion of the engine that had shifted in location. To support this theory, Doncasters sought to introduce evidence that the negligent operation and maintenance of the Twin Otter by multiple non-parties led to portions of the engine shifting in location and coming in contact with the CT-blades. Specifically, Doncasters sought to admit the testimony of its expert, Christopher Andrews, who opined that the Twin Otter was operated without a right torque gauge for fifty-nine flights prior to the crash. Doncasters also sought to admit evidence that Decedent and pilot Scott Cowan, Quantum Leap, Adventure Aviation, and mechanic Norman Walters negligently maintained the Twin Otter by failing to properly conduct an overhaul of the engine. Doncasters contends that the operation of the Twin Otter without a tor-que gauge exposed the engine to undue thermal stress and that this stress, combined with the failure to properly maintain the Twin Otter, became the sole cause of the accident. Accordingly, Doncasters submits that the evidence of negligent operation and negligent maintenance was admissible as an alternative theory of causation, relevant to disprove that its CT-blades caused the accident.

### a. Evidence of Negligent Operation

■ We find that Doncasters' evidence regarding the negligent operation of the Twin Otter without a torque gauge was properly excluded as speculative. Mr. Andrews' opinion was based on an absence of torque recordings on daily data sheets for three weeks prior to the accident. Mr. Andrews assumed, from the lack of recordings alone, that the Twin Otter was in fact operated without a torque gauge for fifty-nine flights. The following testimony, elicited outside the presence of the jury during the voir dire of Mr. Andrews by counsel for Plaintiff James Cowan, reveals the speculative nature of his opinion:

Q: Now, I take it that from the absence of that reading you have now made the conclusion that that means that the torque gauge wasn't working as opposed to some other cause. Is that what—is that where you are?

A: Yes.

Q: Now, you haven't talked to the person who made those entries, have you?

A: No, I haven't.

Q: You haven't talked to any person who has offered you an explanation for why that particular entry is not there, have you?

A: No, I haven't.

Q: And yet you assume that because it's not there that must mean that the torque gauge wasn't working, right?

A: That's correct.[11]

Moreover, as explained by Mr. Andrews, a torque gauge only conveys information to the pilot regarding the amount of horsepower at which the engine is operating. Accordingly, even if we assume that the lack of torque readings on the daily data sheets is indicative that the Twin Otter was operated without a torque gauge, it is speculative to conclude that the lack of a functional torque gauge resulted in undue stress on the engine. As explained by Mr. Andrews:

Q: ... And then what—if the pilot does fly without the torque gauge, what could happen?

A: Well, he *could* over-torque the engine. You *may* over-temp the engine. Those are the two big ones.

. . .

Q: Okay. Now it's true, isn't it, sir, that your opinion relating to the torque gauge, when you said in your deposition that you thought that that contributed, was as follows: The abuse of a hot section [of the engine] as a result of not having the proper torque gauge and relying on ITT, interturbine temperature, cause the deterioration of the hot section, the CT small exit duct assembly.

Now that opinion is based, No. 1, on your *conjecture* that this torque gauge

wasn't working for three weeks before this occurred, right?

A: That's correct.

Q: And it also is dependent on the *conjecture* that even if the torque gauge wasn't working that the engine had been repeatedly over-torqued, right?

A: I have no indication of that either way, whether it was over-torqued.

(emphasis added).

A witness' testimony must be based on personal knowledge. *Hemeyer v. Wilson,* 59 S.W.3d 574, 581 (Mo.App. W.D.2001). "If the testimony of a witness, read as a whole, conclusively demonstrates that whatever he may have said with respect to the issue under investigation was a mere guess on his part and that, in fact, he did not know about that concerning which he undertook to speak, his testimony on the issue cannot be regarded as having any probative value." *Id.* (internal quotation omitted). The above testimony from Mr. Andrews reveals that his opinion regarding undue stress being placed on the engine was based on the stacked assumptions that: (1) the plane was operated without a functional torque gauge, and (2) the operation of the craft with an inoperable torque gauge caused the pilot to operate the Twin Otter at levels causing undue stress on the engine. The trial court excluded the testimony, finding that Mr. Andrews was not "an expert in the field of clairvoyance, if you will, to know whether or not that torque gauge was or was not working." This ruling was not an abuse of discretion.

11. Doncasters also points to testimony that Scott Cowan reported to Walters that the torque gauge had gone inoperative during the last flight on the Sunday preceding the accident. Although this supports a finding that the torque gauge was inoperable for the six days prior to the accident, the testimony also reveals that no flights were made between the time that Walters was contacted about the torque gauge and the time that Walters repaired the torque gauge. Accordingly, this testimony does not support Mr. Andrews' speculative testimony that the Twin Otter was actually flown with an inoperable torque gauge.

### b. Evidence of Negligent Maintenance

The trial court also prohibited Doncasters from pointing the finger at Scott Cowan, Quantum Leap, Adventure Aviation, and Walters for their alleged negligent maintenance of the Twin Otter. Doncasters claims these parties were negligent in failing to properly overhaul the engine. Doncasters further claims that it was entitled to name the parties in order to give context to its alternative cause theory. *See Jefferson v. Lyon Sheet Metal Works*, 376 S.W.3d 37, 43–45 (Mo.App. E.D.2012) (finding that Missouri case law permits defendants to argue the liability of third parties, disagreeing with plaintiff's argument that the law prohibited the defendant from "pointing the finger at" a third party during trial). However, because Mr. Andrews' testimony regarding the operation of the Twin Otter without a torque gauge was properly excluded as speculative, evidence of Doncasters' theory of causation, relying on the combination of negligent operation and negligent maintenance, could no longer be introduced. Accordingly, evidence regarding the negligent maintenance of the Twin Otter was no longer relevant [12] to show Doncasters' alternative cause of the engine failure.

Moreover, although Doncasters was prohibited from naming the parties and arguing their negligence, Doncasters was still permitted to introduce evidence regarding the maintenance of the Twin Otter. Doncasters elicited testimony that the Twin Otter had been flown 6,400 hours without an overhaul, which is 2,800 hours past the time recommended by PWC for an overhaul of the engine. Furthermore, the testimony revealed that all bolts responsible for keeping the engine from shifting into the CT-blades would have been replaced during the overhaul. This testimony directly supported Doncasters' theory of the accident—that a portion of the engine shifted and came into contact with the CT-blades, causing the engine failure. Under these circumstances, we find that Doncasters was not deprived of a fair trial by the inability to point the finger at Scott Cowan, Quantum Leap, Adventure Aviation, and Walters. Accordingly, even if the trial court erred in excluding evidence naming the parties allegedly responsible for the negligent maintenance of the Twin Otter, the exclusion of that evidence did not constitute reversible error. *See Teasdale & Associates*, 373 S.W.3d at 21 (stating that we will reverse only if the party is deprived of a fair trial).

### c. Conclusion

The trial court did not err in excluding evidence relating to the alleged negligent operation and maintenance of the Twin Otter by other parties. Evidence of the negligent operation of the Twin Otter was properly excluded as speculative. Because Doncasters' theory of causation relied on the combined negligent operation and maintenance of the Twin Otter, evidence of negligent maintenance was no longer relevant to Doncasters' alternative causation theory. Moreover, the prohibition of pointing the finger at the other parties allegedly responsible for the negligent maintenance did not prejudice Doncasters where Doncasters was permitted to introduce evidence regarding the allegedly negligent actions of those parties. Point four is denied.

### 5. Evidence of FAA Certification

In its fifth point on appeal, Doncasters claims that the trial court erred in exclud-

12. "Evidence is logically relevant if such evidence tends to make the existence of any material fact more or less probable than it would be without the evidence." *Kroeger-Eberhart v. Eberhart*, 254 S.W.3d 38, 43 (Mo. App. E.D.2007) (internal quotation omitted).

ing evidence that the CT-blades were safety-certified by the Federal Aviation Administration ("FAA"). Doncasters argues that FAA certification was admissible both as proof that the CT-blades were not defective and as rebuttal to assertions that the CT-blades did not meet PWC's specifications or approval. We disagree.

### a. Substantive Evidence

Ordinarily, a trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. *Id.* However, Doncasters failed to preserve for appeal its argument that the FAA certification was admissible as substantive proof that the CT-blades were not defective where, throughout the trial, Doncasters only argued that the FAA certification was admissible as rebuttal to Plaintiffs' evidence and argument. During a pretrial conference, Plaintiffs argued that evidence of FAA certification was not relevant in strict products liability actions. The trial court noted that "[Plaintiffs'] position is probably pretty rock solid on this" but granted Doncasters' request to have twenty-four hours to determine whether there was any authority for the relevance of FAA certification in a strict products liability action. Over a week later, Doncasters filed "Doncasters' Trial Brief Regarding Relevance of [FAA Certification]," which stated that "Doncasters does not dispute that the [certification] issued to Doncasters by the [FAA] regarding the design and production of Doncasters' T–023401 [CT-blades] for Pratt & Whitney Canada's PT6A–20 engine is not relevant to support Doncasters' contention that its [CT-blades] were not defective." Furthermore, at trial, counsel for Doncasters stated "[w]e are not offering FAA certification to prove there was no defect. We are offering it to counter the suggestion . . . ." Doncasters never argued that the FAA certification was admissible as substantive evidence

that the CT-blades were not defective until its motion for new trial.

By failing to raise this argument to the trial court before its motion for new trial, Doncasters has not preserved it for appeal. *See River City Development Associates, LLC v. Accurate Disbursing Co., LLC,* 345 S.W.3d 867, 873 (Mo.App. E.D.2011) (stating that "an appellate court will not convict a trial court of error on an issue which was not before it"); *McGinnis v. Northland Ready Mix, Inc.,* 344 S.W.3d 804, 816 (Mo.App. W.D. 2011) (stating that an "objection cannot be raised for the first time in a motion for new trial") (internal quotation omitted). Unpreserved errors may only be reviewed for plain error. *Rouse v. Cuvelier,* 363 S.W.3d 406, 417 (Mo.App. W.D.2012). Plain error review is rarely applied in civil cases and will only be invoked if the trial court committed an evident, obvious, and clear error that resulted in a manifest injustice or a miscarriage of justice. *Id.* at 417–18.

In *Lay v. P & G Health Care, Inc.,* the defendant in a products liability action sought to admit an inspection report to show that a dumbwaiter was not defective. 37 S.W.3d 310, 331 (Mo.App. W.D.2000). The report was based on whether the dumbwaiter complied with certain federal codes within the industry. *Id.* at 331–32. On appeal, the Western District Court of Appeals noted that "[c]ompliance with the minimum federal standards does not mitigate a manufacturer's responsibility under the theory of strict liability." *Id.* at 332 (internal quotation omitted). This is because, in a strict liability action, the jury only considers whether the product was defective, not whether the manufacturer knew it was defective. *Id.* Accordingly, the Court held that "the trial court properly refused to admit [the report] because

that inspection was based on the [federal] standards in effect at that time, and those standards are clearly inadmissible in a strict liability claim." *Id.*

■ Here, Doncasters argues that the FAA certification of the CT-blades was admissible as proof that the CT-blades met the government's requirements and standards for safety and therefore were not defective. In light of *Lay,* we cannot find that the trial court plainly erred in excluding evidence of FAA certification as substantive proof that the CT-blades were not defective.

### b. Rebuttal

■ Doncasters also argues that evidence of FAA certification, even if inadmissible as proof that the CT-blades were not defective, was admissible as rebuttal to evidence offered by Plaintiffs. Specifically, Doncasters points to the following testimony from Dr. Hoeppner:

Q: Why were [the CT-blades] defective . . . and unreasonably dangerous, Doctor?

A: Well, they were defective because the material that was in the blade was an improper material. It wasn't one that satisfied the design criteria that [PWC] had of the blade.

Q: And what about the coating?

A: And the coating was not an acceptable coating. It was a different coating than had been acceptable to [PWC] when they manufactured the engine originally.

During subsequent cross-examination, Dr. Hoeppner also testified:

Q: . . . the material you're claiming fell out of favor, [Inconel] 713, is the material you're saying my client should have used to make its blades?

A: Well, that was the only material to my knowledge—at the point in time where this material your client selected, that was the only material approved by [PWC] for utilization in the PT6–20A (sic) engine.

Doncasters asserts that this testimony, along with Plaintiffs' opening arguments indicating that the CT-blades did not meet PWC design criteria, gave the jury the impression that the CT-blades had to meet PWC's specifications and approval. Accordingly, Doncasters claims that evidence of FAA certification was admissible to show that only FAA approval is necessary when selling replacement Twin Otter parts, rebutting any implication that approval from an original manufacturer, like PWC, is required.

"A party may introduce evidence to rebut that of his or her adversary, and for this purpose any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible." *Moore v. Ford Motor Co.,* 332 S.W.3d 749, 768 (Mo. banc 2011) (internal quotation omitted). Trial courts are given broad discretion in the admission of rebuttal evidence and this Court gives substantial deference to the exercise of that discretion. *Id.*

■ Here, Dr. Hoeppner's testimony was limited to the opinion that Doncasters' CT-blades were defective because they did not meet PWC's design criteria and specifications. Evidence that the CT-blades did not meet the design specifications approved by PWC is not the equivalent of an assertion that Doncasters' CT-blades needed approval from PWC. Because Plaintiffs introduced no evidence that Doncasters was required to seek the approval of PWC, evidence of FAA certification was not relevant to explain, repel, counteract, or dis-

prove any evidence introduced at trial.[13]

### c. Conclusion

The trial court did not plainly err in excluding evidence of the FAA certification as substantive proof that the CT-blades were not defective, and the trial court did not abuse its discretion in excluding the same evidence as rebuttal to Plaintiffs' evidence and argument. Point five is denied.

### 6. Discovery Sanction Against Doncasters

■ In Doncasters' sixth point on appeal, it contends that the trial court erred in bifurcating the jury's consideration of compensatory liability and damages from its consideration of punitive liability and damages as a discovery sanction. We disagree.

■ We review the trial court's imposition of discovery sanctions for an abuse of discretion. *Trotter v. Distler*, 260 S.W.3d 913, 915 (Mo.App. E.D.2008). An abuse of discretion occurs when the trial court's ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* (internal quotation omitted).

Doncasters' discovery violation consisted of the untimely production of over 8,000 documents. The trial court noted that the "prejudice to Plaintiffs as a result of this massive production of documents at [the] late date is grave and manifest" because Plaintiffs' "effective use of these documents is severely restricted." Accordingly, the trial court entered a discovery sanction bifurcating the trial into two phases. The jury determined compensatory liability and damages during the first phase of the trial and punitive liability and damages during the second phase of the trial. Under the discovery sanction, Doncasters was prohibited, during the first phase of the trial, from introducing any late-produced documents into evidence or from referencing such documents in argument except to the extent that Plaintiffs voluntarily injected the documents in evidence.[14] Doncasters was, however, permitted to introduce the late-produced documents during the second phase of the trial.

---

13. Doncasters also complains of testimony from Yvon Boileau, a PWC employee, who testified that PWC never approved Doncasters' CT-blades. To the extent that this testimony, or any other testimony introduced at trial, suggested to the jury that Doncasters needed PWC approval of its CT-blades, Doncasters was given the opportunity to clarify at trial. Boileau clarified, in response to questions from Doncasters, that a part not approved by PWC means only that the part is not one that appears in the PWC parts catalogue. Furthermore, in its examination of Nicolas Grivas, a PWC employee, and Donald Sommer, Plaintiffs' aircraft engine failure analyst, Doncasters was able to elicit testimony that PWC never conducted tests on Doncasters' CT-blades and that no company could meet PWC's specifications unless it used the same material as PWC. This allowed Doncasters to argue to the jury during closing argument that "[w]hether or not some competitor's blade or part meets the [PWC] spec[ifications] is irrelevant because ... [y]ou have to be [PWC] to meet their spec[ifications]" and "the only way you can be a[PWC]-approved part is if you're in the [PWC] catalog and the only way you're in the [PWC] catalog is if you're a[PWC] part." Accordingly, we find that Doncasters was able to effectively refute any suggestion that PWC approval was necessary. Therefore, even if the trial court erred in excluding evidence of FAA certification as rebuttal evidence, Doncasters was not prejudiced.

14. The sanction also ordered that "Doncasters' liability expert witnesses must present live testimony at trial so as to provide Plaintiffs the opportunity to cross-examine regarding the documents received in these untimely document productions." Doncasters does not take issue with this portion of the sanction.

Rule 61.01(d)(1)[15] states that if a party "fails to produce documents ... as requested under Rule 58.01 ... the court may ... make such orders in regard to the failure *as are just* and among others ... prohibit the disobedient party from introducing designated matters in evidence." (emphasis added). Although Rule 61.01 does not expressly state that a trial court may bifurcate a trial and limit the introduction of evidence to only a portion of the trial, "if a court has been granted certain authority, it must possess all component powers of such authority." *Goede v. Aerojet General Corp.*, 143 S.W.3d 14, 22 (Mo. App. E.D.2004) ((abrogated on other grounds) (finding that because Rule 61.01 allows the trial court to enter default judgment against a disobedient party, the court also has the power to remove questions of fact from the jury as a discovery sanction)). Therefore, Rule 61.01 necessarily gives trial courts the authority to limit the introduction of evidence to specific portions of a trial.

Moreover, Rule 61.01(d) allows the trial court to make any order that is "just." Any such order should accomplish the purposes of discovery which include eliminating concealment and surprise. *Fairbanks v. Weitzman*, 13 S.W.3d 313, 327 (Mo.App. E.D.2000). Here, the trial court was clearly worried about the prejudicial effect resulting from Plaintiffs' "severely restricted" ability to analyze the 8,000–plus documents. In accordance with this concern, the trial court prohibited the use of the documents by Doncasters during the first phase of the trial in order to prevent unjust surprise to Plaintiffs. Under Rule 61.01, the trial court could have prohibited Doncasters from using the documents during the course of the entire trial. However, the court chose a less extreme remedy to the clear benefit of Doncasters. The trial court later stated that "the theory, right or wrong, at the time by me was that by putting the punitive liability in the second phase I was then authorizing the defense to use documents that had been withheld and thereby thinking that I was doing them a favor, and I still think so." Under these circumstances, we find that the trial court's discovery sanction was "just" and authorized under Rule 61.01.

Nevertheless, Doncasters submits that the trial court abused its discretion in entering the discovery sanction because it was in violation of the bifurcation procedures set forth in section 510.263 RSMo Supp.2006 and MAI 35.19. Section 510.263.1 states that "[a]ll actions tried before a jury involving punitive damages ... shall be conducted in a bifurcated trial before the same jury if requested by any party." During the first stage of the trial, "the jury shall determine liability for compensatory damages, the amount of compensatory damages, ... and the liability of a defendant for punitive damages." Section 510.263.2. If the jury finds the defendant liable for punitive damages during the first stage, "that jury shall determine, in a second stage of trial, the amount of punitive damages to be awarded...." Section 510.263.3. MAI 35.19 includes the following language to be given to the jury after the first phase of a trial conducted under the procedures set forth in section 510.263:

> If you find that defendant is liable for punitive damages in this stage of the trial, you will be given further instructions for assessing the amount of punitive damages in the second stage of the trial.

Doncasters submits that the failure to follow the procedure set forth under section

---

15. All references to Rules are to Missouri Supreme Court Rules (2012).

510.263 and MAI 35.19 resulted in the jury not knowing that it would be given the opportunity to assess punitive damages in the second phase of the trial. Therefore, Doncasters argues that the jury was permitted to consider punishment in determining the compensatory damages verdicts.

However, Doncasters never complained of the procedure utilized by the trial court or alleged that the procedure violated section 510.263 until after the jury returned its compensatory damages verdicts. The record also reveals that Doncasters never objected to the jury instructions submitted by the trial court on the ground that they did not comply with MAI 35.19, and Doncasters did not request an instruction based on MAI 35.19.[16]

By failing to raise these arguments to the trial court before the jury returned its verdicts in the first phase of the trial, Doncasters has not preserved them for appeal. *See Norris v. Barnes*, 957 S.W.2d 524, 527 (Mo.App. W.D.1997) ("[f]ailing to object at trial results in no issue being preserved for appellate review, because a trial court cannot be faulted for failing to take corrective action that it was not asked to take"). The discovery sanction issued by the trial court was just and therefore authorized under Rule 61.01. Point six is denied.

### 7. Remittitur

In its seventh point on appeal, Doncasters claims that the trial court erred in denying its motion for remittitur. After the first phase of the trial, the jury returned compensatory damages verdicts finding Doncasters liable for the deaths of Decedents and awarding Plaintiffs a collec-tive $20 million in compensatory damages, $4 million for each wrongful death claim. On appeal, Doncasters asserts the trial court erred in denying its motion for remittitur because the verdicts were grossly excessive and contrary to the evidence. We disagree.

Broad discretion is given to the jury in determining a party's injury. *Evans v. FirstFleet, Inc.*, 345 S.W.3d 297, 302 (Mo.App. S.D.2011). However, under section 537.068, "[a] court may enter a remittitur order if . . . the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." We review a trial court's decision on remittitur for an abuse of discretion. *Evans*, 345 S.W.3d at 302. Our review is limited to evidence supporting the verdict, and we will exclude any contrary evidence. *Id.* at 303. Moreover, when the trial court approves a jury's verdict, its discretion is practically conclusive. *Id.* at 305.

"Since the appellate court does not weigh the evidence, it is limited to inquiring whether the jury's verdict is supported by substantial evidence." *Id.* at 302 (internal quotation omitted). In a wrongful death action, compensatory damages may be based on pecuniary losses suffered by the loss of services, consortium, companionship, comfort, and support, along with the pain and suffering experienced by the decedent as a result of the defendant's misconduct. *Martin v. Survivair Respirators, Inc.*, 298 S.W.3d 23, 35 (Mo.App. E.D. 2009) (citing section 537.090).

Here, Plaintiffs elicited testimony from Dr. John Ward, Plaintiffs' forensic

---

16. We note that MAI 35.19 is an illustrative instruction, as opposed to a mandated instruction. *Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 653–54 (Mo. App. W.D.1997) (overruled on other grounds). "It can not amount to reversible error in this case to fail to heed language in an illustrative instruction." *Id.* at 654.

economics expert, as to the economic loss sustained by each Plaintiff. Dr. Ward testified to $704,146 in economic loss to Plaintiff Susan Delacroix, up to $765,695 in economic loss to Plaintiff Barbara Berridge, up to $1,857,682 in economic loss to Plaintiffs Mark Cook and Annette Bachand, and $423,546 in economic loss to Plaintiff Joan Walsh and Plaintiff James Cowan. Although the economic losses opined by Dr. Ward do not reach half of the total award that the jury awarded for each wrongful death claim, "there is no bright-line rule that non-economic damages cannot exceed economic damages by any certain multiplier...." *Evans*, 345 S.W.3d at 304 (internal quotation omitted); *see also Barnett*, 963 S.W.2d at 658 (finding $3.5 million award in wrongful death case was appropriate when plaintiffs' undisputed economic losses were only $649,080).

As to non-economic damages, evidence was introduced regarding the loss of consortium and companionship sustained by Plaintiffs. Plaintiffs testified to the close and loving relationship they enjoyed with Decedents. As previously discussed in our analysis of point one, Plaintiffs could also recover for the pain and suffering sustained by Decedents prior to their death. Dr. Diaz testified to "horrific" pain and suffering sustained by Decedents as the result of pre-impact terror felt by Decedents prior to the crash. As to Decedent Victoria Delacroix, Dr. Diaz testified that she suffered conscious pain and suffering following the crash until her death three days later. "The range between an inadequate award and an excessive award for pain and suffering can be enormous" and "[s]ubstantial disparity among juries as to what constitutes pain and suffering must be expected." *Barnett*, 963 S.W.2d at 658.

Viewed in the light most favorable to Plaintiffs, there was substantial evidence supporting the jury's compensatory damages verdicts. Because we find that the jury's verdicts were supported by substantial evidence, the verdicts were not grossly excessive, and the trial court did not abuse its discretion in denying Doncasters' motion for remittitur. Point seven is denied.

## 8. Reduction of Judgment

In its eighth point on appeal, Doncasters asserts that the trial court erred in denying its motion for reduction of the judgment because, under section 537.060, the verdicts should have been reduced by amounts recovered by Plaintiffs in settlement agreements reached with joint tortfeasors. We disagree.

Section 537.060 provides that a defendant's liability will be reduced by the amount of settlements entered between a plaintiff and other joint tortfeasors. *Sanders v. Ahmed*, 364 S.W.3d 195, 211 (Mo. banc 2012). Specifically, section 537.060 states in relevant part that:

> When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort for the same injury or wrongful death, such agreement shall not discharge any of the other tortfeasors for the damage unless the terms of the agreement so provide; however *such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater.*

(emphasis added). When, as here, there were no factual issues submitted and the trial court ruled on the issue of reduction as a matter of law, we review the trial court's denial of a reduction under section 537.060 de novo. *Gibson v. City of St. Louis*, 349 S.W.3d 460, 465 (Mo.App. E.D. 2011).

A reduction under section 537.060 is an affirmative defense that must be pled and proved. *Sanders*, 364 S.W.3d at 211. The burden lies with the defendant to plead and prove: (1) that a settlement exists, and (2) the stipulated amount of the agreement or the amount actually paid. *Id.* at 211–12.

When pleading an affirmative defense, a defendant must set forth facts showing that the defendant is entitled to the defense. Rule 55.08; *Echols v. City of Riverside*, 332 S.W.3d 207, 211 (Mo.App. W.D.2010). Here, Doncasters pled the following in its answer to Plaintiffs' petitions:

> That Doncasters, Inc. claims offsets and contribution from the settlements and/or verdicts in this lawsuit or any other litigation and/or claim arising out of the facts and circumstances at issue in this case.

> That if any judgment is entered against Doncasters, Inc. based on the events and allegations stated in Plaintiffs' [petitions], that judgment must be reduced by either (1) the stipulated amount of all settlement agreements between Plaintiffs and all other alleged tortfeasors or (2) the amount of consideration all other alleged tortfeasors paid to Plaintiffs for release or discharge, whichever is greater, as provided in [section] 537.060.

These allegations amount to legal conclusions that fail to allege any facts regarding the applicable settlements giving rise to Doncasters' affirmative defense. "A pleading that makes a conclusory statement and does not plead the specific facts required to support the affirmative defense fails to adequately raise the alleged affirmative defense, and the alleged affirmative defense fails as a matter of law." *Echols*, 332 S.W.3d at 211 (internal quotation omitted).[17]

Doncasters also failed to prove the defense at trial. In *Ozark Air Lines, Inc. v. Valley Oil Co., L.L.C*, a defendant sought a reduction by pretrial settlement amounts pursuant to section 537.060. 239 S.W.3d 140, 145 (Mo.App. W.D.2007). The defendant never discussed the settlements at trial and waited until after the verdict was rendered and the jury was discharged before raising the issue. *Id.* On appeal, the Court found that the defendant "failed to prove the defense at trial" and therefore was "not entitled to a reduction of the judgment." *Id.* Like the defendant in *Ozark Air Lines*, Doncasters never discussed the settlements at trial and waited until after the verdicts were rendered and the jury was discharged before raising the issue in a post-trial motion. Accordingly, Doncasters failed to meet its burden to prove the affirmative defense.[18]

---

**17.** Similar pleadings were allowed in *McGuire v. Kenoma, LLC*, 375 S.W.3d 157 (Mo.App. W.D.2012). However, in *McGuire*, the documentation of the settlements was not provided to the defendant until after the case was submitted to the jury and the jury returned its verdict. *Id.* at 180–81. Under those circumstances, the affirmative defense was properly set forth because the defendant "included all facts in its possession at the time the answer was filed and the settlement occurred too late in the process to make a request to amend the answer of any practical effect." *Id.* at 181. The Court noted that the allegations would have been insufficient if the settlements had been known to the defendant at the time the defendant filed its answer. *Id.* at 181 n. 18. Here, the settlements allegedly entitling Doncasters to a reduction were entered into prior to Doncasters' filing of its answers, and therefore *McGuire* does not aid Doncasters.

**18.** The *McGuire* Court excused the failure to raise the issue of reduction during the trial. 375 S.W.3d at 182. However, as previously indicated, the documentation of the amount and terms of the settlements was not provided by the plaintiffs to the defendant until after the case was submitted to the jury and the jury returned its verdict. *Id.* at 180–81. Moreover, the defendant in *McGuire*, in its

Because Doncasters failed to properly plead or prove its affirmative defense of reduction under section 537.060, the trial court did not err in denying Doncasters' motion for reduction of the judgment. Point eight is denied.

### 9. Cumulative Error

In its ninth and final point on appeal, Doncasters claims that the trial court erred in denying its motion for a new trial because the cumulative effect of all the errors presented in points one through seven prevented Doncasters from receiving a fair trial. We disagree.

 "[A] new trial can be ordered due to cumulative error, even without deciding whether any single point would constitute grounds for reversal." *DeLaporte v. Robey Bldg. Supply, Inc.*, 812 S.W.2d 526, 536 (Mo.App. E.D.1991). However, "[a]ny number of non-errors cannot add up to an error." *Shepherd v. State*, 529 S.W.2d 943, 948 (Mo.App.1975). Because we find no error in any of the first seven points on appeal, we need not address the cumulative effect of the alleged errors. Point nine is denied.

### 10. Conclusion as to Doncasters' Appeal

The portion of the trial court's judgment entered upon the jury's verdicts awarding Plaintiffs $4 million in compensatory damages for each wrongful death claim is affirmed.

### B. Plaintiffs' Cross–Appeal

 In their sole point on cross-appeal, Plaintiffs claim the trial court erred in granting Doncasters' motion for judgment

notwithstanding the verdict as to the jury verdict awarding Plaintiffs a collective $28 million in punitive damages, resulting in $5.6 million in punitive damages for each wrongful death claim. We agree.

### 1. Standard of Review

 A trial court's decision to grant a motion for judgment notwithstanding the verdict is reviewed to determine whether a submissible case was made. *Payne v. Cornhusker Motor Lines, Inc.*, 177 S.W.3d 820, 832 (Mo.App. E.D.2005). The determination of whether a submissible case was made is a question of law that we review de novo. *Id.* We view the evidence and all inferences drawn therefrom in the light most favorable to the verdict and will affirm the grant of a judgment notwithstanding the verdict only if we find that a submissible case was not made. *Id.* A judgment notwithstanding the verdict is a drastic action that can only be granted if reasonable persons cannot differ on the disposition of the case. *Id.* Moreover, there is a presumption favoring the reversal of a judgment notwithstanding the verdict, and this Court "will not overturn a jury verdict unless there is a *complete absence of probative facts* to support it." *Id.* (emphasis added).

### 2. Submissibility of the Case

 In order to recover punitive damages in a strict products liability action, a plaintiff must present clear and convincing evidence that the defendant "placed in commerce an unreasonably dangerous product with actual knowledge of the product's defect" and that, by doing so, "the defendant showed a complete indifference

---

motion for a reduction, "attached the relevant settlement documentation that irrefutably proved that the underlying settlement in fact occurred." *Id.* at 182. Here, the settlements were reached prior to trial, and, like the defendant in *Ozark Air Lines*, Doncasters had

the opportunity to discuss the settlements at trial but failed to do so. Furthermore, unlike the defendant in *McGuire*, Doncasters never attached the relevant settlement documentation to post-trial motions filed with the trial court.

to or conscious disregard for the safety of others." *Smith,* 275 S.W.3d at 812–13 (internal quotations omitted). A plaintiff presents clear and convincing evidence if the evidence is sufficient to permit a reasonable juror to conclude, with convincing clarity, the truth of the proposition to be proved. *Id.* at 813.

In granting Doncasters' motion for judgment notwithstanding the verdict, the trial court found that "Plaintiffs did not adduce clear and convincing evidence that at the time of the sale by [Doncasters] of the part in issue in this case that [Doncasters] had actual knowledge of the defect upon which the compensatory verdict[s were] based." As previously discussed, Plaintiffs introduced substantial evidence that Doncasters' CT-blades were defective because the material used in the manufacture of the CT-blades, SermaLoy J and Inconel–738, did not satisfy the specific design criteria of the original manufacturer and rendered the CT-blades prone to cracking and oxidation. Accordingly, this Court can only affirm the trial court's judgment notwithstanding the verdict if there is a complete absence of evidence to support a finding that: (1) Doncasters had, at the time the CT-blades were sold, actual knowledge that the materials used in the manufacture of the CT-blades rendered them defective, and (2) Doncasters showed a complete indifference to or conscious disregard for the safety of others by selling the defective CT-blades. *See Payne,* 177 S.W.3d at 832 (stating that a jury verdict will not be overturned "unless there is a complete absence of probative facts to support it").

### a. Actual Knowledge of the Defect

During the second phase of the trial, Plaintiffs presented evidence that the CT-blades at issue in this case never passed a

150–hour endurance test in a PT6A–20 engine.[19] Donald Sommer, Plaintiffs' aircraft engine failure analyst, testified that the subject CT-blades failed two tests prior to their manufacture for use in a PT6A–20 engine. He indicated that the first test was interrupted after 142 hours due to the failure of both PWC CT-blades and Doncasters' CT-blades. The second test was interrupted after 113.5 hours and indicated that the subject CT-blades did not pass the 150–hour endurance test due to excessive stretching.

With no objection from Doncasters, Mr. Sommer and Dr. David Hoeppner, Plaintiffs' aircraft engine design expert, testified that this failure provided Doncasters with actual knowledge, at the time the CT-blades were sold in this case, that the CT-blades were in a defective condition. Specifically, Mr. Sommer gave the following testimony:

Q: On the basis of this information and all of the other test data that you have reviewed, do you have an opinion to a reasonable degree of engineering certainty whether this subject [CT-blade] was ever successfully tested in the PT6A–20 model engine, Mr. Sommer?

A: No sir. All the documents I looked at indicate that it was never successfully tested in the model of engine it was designated for.

. . .

Q: And were the results—to your knowledge and your review of this information, were the results of these unsuccessful tests clearly and unequivocally known to Doncasters and all of its predecessor companies at this time, sir?

---

**19.** A 150–hour endurance test is necessary to achieve FAA certification of a component part. It tests the endurance and durability of the engine and its components.

A: Absolutely. That's where we obtained the documents.

Q: Would it be clear to you that Doncasters or its prior companies on or about 1986, well before the sale of our parts, *had actual knowledge* that these particular blades were not fit for the particular purpose intended, which would be use in the model 20 Pratt engine, sir?

A: Yes, sir. Clearly, they did know that.

Q: And would they have *actual knowledge* that those parts were in a defective condition prior to their being manufactured and sold in our case, sir?

A: Yes.

(emphasis added). Dr. Hoeppner gave the following testimony:

Q: Do you have an opinion to a reasonable degree of engineering certainty, Doctor, *that at the time Doncasters, Inc., sold the [CT-blades] in this case whether it had actual knowledge of the defective condition* of the [CT-blades] for use in the model 20 engine? Do you have an opinion?

A: Yes ... That *they had that actual knowledge* before—before the blades were sold and put in the subject engine.

Q: And did you rely to some extent on their—on what happened with respect to the 150–hour testing? Let's bring—

A: Yes.

(emphasis added).

Although Mr. Sommer and Dr. Hoeppner did not expressly state the defec-

tive condition to which they were referring, the jury could, relying on prior testimony as to the defective condition of the CT-blades, reasonably infer that the defective condition referred to in this testimony was the use of SermaLoy J and Inconel–738 in the manufacture of the CT-blades.

Doncasters argues that this expert testimony is insufficient to support Plaintiffs' claim for punitive damages because "[s]tripped to its core, [Plaintiffs'] proof that Doncasters purportedly had actual knowledge of a deficiency in its CT-blades was based on *ipse dixit*, speculative testimony of their 'experts.'" However, Missouri law is clear that once expert testimony is admitted, the jury is entitled to rely on that testimony when reaching its verdict:

> If a question exists as to whether the proffered opinion testimony of an expert is supported by a sufficient factual or scientific foundation, the question is one of admissibility. It must be raised by a timely objection or motion to strike. *Once opinion testimony has been admitted, as other evidence, it may be relied upon for purposes of determining the submissibility of the case.* The jury then considers the natural probative effect of the opinion testimony.

*Sanders*, 364 S.W.3d at 208–09 (internal quotations omitted) (emphasis added). Here, the opinion testimony of Mr. Sommer and Dr. Hoeppner was admitted without objection, and the jury was entitled to rely on the testimony when reaching its verdict. *Id.*[20]

---

**20.** The dissent argues that the experts' testimony falls short of the clear and convincing standard of proof because it establishes only that Doncasters *should have known* or *must have known* that the CT-blades were defective.

However, as the above testimony makes clear, Mr. Sommer and Dr. Hoeppner both opined that Doncasters had *actual knowledge* that the CT-blades were defective. Once admitted, the weight to be afforded to the testimony was for

■ "[I]n close cases such as this one, the presumption favoring the reversal of a [judgment notwithstanding the verdict] is a significant factor." *Payne*, 177 S.W.3d at 834. The presumption is only overcome where "the evidence and inferences favorable to the plaintiff leave no room for reasonable minds to differ as to the outcome." *Laws v. St. Luke's Hosp.*, 218 S.W.3d 461, 466 (Mo.App. W.D.2007) (internal quotation omitted). The testimony from Mr. Sommer and Dr. Hoeppner refutes the trial court's finding that there is a complete absence of evidence to support the jury's finding that Doncasters had actual knowledge, at the time the CT-blades were sold, that the materials used in the manufacture of the CT-blades rendered them defective. Viewing the evidence and the reasonable inferences drawn therefrom in the light most favorable to the verdict, we find that Plaintiffs presented sufficient evidence from which a reasonable juror could find, with convincing clarity, that Doncasters had actual knowledge at the time the CT-blades were sold that the materials used in the manufacture of the CT-blades rendered them defective.

### b. Complete Indifference to or Conscious Disregard for the Safety of Others

■ As previously indicated, the trial court's grant of judgment notwithstanding the verdict must also be affirmed if there is a complete absence of evidence to support a finding that Doncasters showed a complete indifference to or conscious disregard for the safety of others by selling the defective CT-blades. "'Conscious disregard or complete indifference' includes situations where the person doing the act or failing to act must be conscious from the

knowledge of surrounding circumstances and existing conditions, that, although lacking specific intent to injure, the person's conduct or failure to act will naturally or probably result in injury." *Smith*, 275 S.W.3d at 813 (internal quotation omitted).

Here, Mr. Sommer and Dr. Hoeppner both testified that Doncasters' actions constituted a disregard for the safety of others. Mr. Sommer testified:

Q: With respect to a manufacturer which would knowingly put the public at peril by selling a part that was known to be defective, do you have an opinion whether that would constitute reckless disregard for safety, Mr. Sommer?

A: Yes, sir. In my opinion, it certainly does constitute reckless disregard for safety of the persons using those parts.

Q: And did Doncasters continue to sell this part over the many years with actual knowledge that it was defective and dangerous and could fail because it didn't pass these tests?

A: Yes, sir. I believe that.

Dr. Hoeppner testified:

Q: Dr. Hoeppner, on the basis of your review of the actions of this company, your understanding and long work within the aviation field, do you have an opinion to a reasonable degree of engineering certainty whether actions of this company with respect to the design, the marketing and the sale of this blade showed a complete indifference to

the jury's consideration in determining whether Plaintiffs met the clear and convincing standard of proof. On appeal, the standard of review limits this Court to a determi-

nation of whether there is a complete absence of evidence to support the jury's determination. *See Payne*, 177 S.W.3d at 832.

or conscious disregard for human safety?

. . .

A: Well, they were indeed reckless. . . .

Q: In your profession, how do you characterize a company that would sell a blade intended for a particular engine without ever having successfully passed the most basic, simple tests in that engine?

A: Absolutely reckless. And just unbelievable to me.

Q: Have you ever seen anything like it?

A: I have never in my career seen anything like this.

Q: Did [Doncasters] know the specific design criteria?

A: Well, they didn't know any of that. They had no criteria. They had no life estimate procedure. They basically had nothing other than maybe dimensions that they had taken off existing blades from [PWC], and they call that design. I call that configurational design, but that's only a tiny piece. And their lack of pursuing the design criteria similar to what we looked at on my fatigue criteria or reliability criteria is absolutely mind-boggling to me. It's totally unbelievable.

Q: Dr. Hoeppner, if an aftermarket component part manufacturer in your industry, the aviation industry, seeks to copy original equipment and it doesn't use the same material and it doesn't use the same coating and it doesn't seek to understand the operational environment of the

engine or whatever it is, how do you characterize that, Doctor?

A: Well, it's impossible. It's—it's basically playing craps or gambling with whoever's going to use that component.

Furthermore, Doncasters' corporate representative testified and agreed that the failure of a CT-blade in-flight has a high likelihood of causing serious injury or death to passengers due to the potential of the crash. He also agreed that, within the aviation industry, a company that sells a product which it knows to be defective is acting recklessly.

Viewing this evidence and the reasonable inferences drawn therefrom in the light most favorable to the verdict, we find that Plaintiffs presented sufficient evidence from which a reasonable juror could find, with convincing clarity, that Doncasters showed a complete indifference to or conscious disregard for the safety of others.

### c. Conclusion

█ Plaintiffs presented sufficient evidence from which a reasonable juror could find, with convincing clarity, that Doncasters had actual knowledge of the defective conditions of the CT-blades at the time they were sold and that Doncasters acted with a complete indifference to or conscious disregard for the safety of others. Accordingly, the trial court was correct in submitting the case to the jury and erred in taking the drastic action of granting Doncasters' motion for judgment notwithstanding the verdict as to the verdict awarding Plaintiffs punitive damages.[21] Point one on cross-appeal is granted.

21. Doncasters argues that even if Plaintiffs made a submissible case of punitive liability, the judgment notwithstanding the verdict should be affirmed because the jury's verdict violates several provisions of the United States Constitution. However, Doncasters failed to allege any constitutional errors in either of its motions for directed verdict in the second phase of the trial. Because a judgment notwithstanding the verdict is a motion

### 3. Doncasters' Claim for New Trial

Additionally, Doncasters claims that if the trial court's judgment notwithstanding the verdict is reversed, the case should be remanded for a new trial due to multiple errors committed by the trial court during the second phase of the trial.

### a. Evidence of Other Incidents

 Doncasters first claims that the trial court erred in introducing evidence of other incidents. During the second phase of the trial, the trial court allowed Plaintiffs, during redirect, to question Woodrow Estabrook, Doncasters' corporate representative, regarding evidence of other incidents previously ruled inadmissible by the trial court for being factually dissimilar. The trial court allowed the evidence to impeach the following testimony elicited by Doncasters in its cross-examination of Mr. Estabrook:

Q: And speaking on behalf of the company, have you ever—ever been of the view that the blade was defective in any way whatsoever?

A: No.

Doncasters argues that evidence of other incidents was not proper to rebut Mr. Estabrook's testimony because the other incidents were factually dissimilar and did not suggest any defect in the CT-blades. Doncasters also argues that the impeachment was improper because Mr. Estabrook was called as a witness by Plaintiffs, and a party may not impeach its own witness.

We find that any error the trial court may have committed in allowing Plaintiffs

to question Mr. Estabrook regarding other incidents was not prejudicial. This questioning occurred during the second phase of the trial, after the jury had already concluded that the product was defective. Accordingly, the use of other dissimilar incidents could not have impacted the jury's determination of that issue. Nor was the evidence probative of the jury's determination of Doncasters' actual knowledge of the defective condition at the time the CT-blades were sold, the principal issue involved in the second phase of the trial. The trial court limited Plaintiffs' questioning to the impeachment of Mr. Estabrook's testimony and did not allow Plaintiffs to argue that the incidents were factually similar or showed that Doncasters had knowledge of the defect. Moreover, each incident used to impeach Mr. Estabrook occurred after 2001. Accordingly, the evidence of other incidents was not probative to the jury's determination of Doncasters' conduct in 1996, at the time the CT-blades were sold in this case. Under these circumstances, we do not find a reasonable probability that the outcome of the trial was affected by Plaintiffs' use of other incidents to impeach Mr. Estabrook. *See Teasdale & Associates,* 373 S.W.3d at 21 (stating that "[e]rror is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial") (internal quotation omitted).

### b. Expert Qualifications/Expert Summaries

 Doncasters also submits that the trial court erred in allowing Plaintiffs' ex-

---

to have judgment entered in accordance with a motion for directed verdict, "a sufficient motion for a directed verdict is required to preserve the motion for judgment notwithstanding the verdict and for appeal." *Hatch v. V.P. Fair Foundation, Inc.,* 990 S.W.2d 126, 137 (Mo.App. E.D.1999). "[Doncasters'] failure to raise these issues as grounds for its

motion for directed verdict precluded it from obtaining a judgment notwithstanding the verdict in its favor on these grounds and further precludes it from obtaining appellate review of the trial court's failure to enter judgment notwithstanding the verdict on these grounds." *Id.* at 137–38.

perts to testify beyond their expertise. Specifically, Doncasters claims that it was error to allow Raymond Twa, Plaintiffs' FAA certification expert, to offer engineering opinions and for Dr. Hoeppner and Mr. Sommer to offer legal and FAA certification opinions. We disagree.

■ Section 490.065 governs the admission and exclusion of expert testimony in civil cases in Missouri. Section 490.065.1 states in relevant part that "a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Ordinarily, we review the trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Adkins v. Hontz*, 337 S.W.3d 711, 719 (Mo.App. W.D.2011).

■ However, with respect to the testimony and opinions offered by Dr. Hoeppner and Mr. Sommer, Doncasters offered no objections to the opinions it now complains were outside the scope of their expertise. Nor did Doncasters complain of these opinions in its motion for new trial. "[A]llegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case." Rule 84.13(a).

Doncasters did object to the admission of testimony from Mr. Twa.[22] Mr. Twa was offered as an expert in certification procedures, and the trial court specifically admitted him as an expert to testify as to whether "[Doncasters] did what they had to do or they didn't do what they had to do" when complying with FAA certification.

Doncasters argues that Mr. Twa gave engineering opinions outside the scope of this expertise when he testified that a real PT6A–20 engine was not under test when the CT-blades were certified, that he never found evidence that the CT-blades had been successfully tested in a PT6A–20 engine, and that certification should not have been issued by the FAA. Doncasters also complains of Mr. Twa's testimony regarding FAA regulations and his opinion that Doncasters was not lawfully selling the CT-blades because they did not have a valid FAA certification. The testimony Doncasters complains of on appeal is consistent with Mr. Twa's expertise and the trial court's ruling that he could testify to Doncasters' compliance with FAA certification procedures. Mr. Twa's opinions were limited to his conclusions regarding Doncasters' compliance with FAA certification, and he did not offer engineering opinions. Accordingly, Mr. Twa did not testify outside the scope of his expertise,[23]

22. Doncasters presented this objection as an objection to the introduction of a written summary of Mr. Twa's opinions. On appeal, Doncasters also argues that the introduction of this written summary was erroneous as hearsay and unduly cumulative evidence that further compounded the error of allowing testimony outside the scope of Mr. Twa's expertise. However, Doncasters objected to the summary of Mr. Twa's findings only on the ground that his opinions went beyond the scope of his expertise. Accordingly, any claim that the summary was inadmissible for any other reason was not preserved for appeal. *See Krame v. Waller*, 849 S.W.2d 236, 239 (Mo.App. E.D.1993) (stating that "[a] party may not present for consideration on ap-

peal a different ground than that asserted at trial") (internal quotation omitted).

23. Moreover, as noted by Doncasters in its brief, Mr. Twa's testimony was largely cumulative of opinions offered by Mr. Sommer, and, as previously indicated, those opinions were introduced without objection from Doncasters. "A party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection." *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 134 (Mo. banc 2007) (internal quotation omitted).

and the trial court did not err in admitting the expert testimony of Mr. Twa, Dr. Hoeppner, and Mr. Sommer.

### c. Closing Argument

■ Doncasters also contends that the trial court erred in permitting Plaintiffs' counsel to inform the jury during closing argument that half of any punitive damage award would go to Missouri's Tort Victims' Compensation Fund because such an argument was outside the evidence and instructions in the case. We disagree.

■ Trial courts are given broad discretion when deciding whether to permit or prohibit statements during closing arguments, and we will not reverse the trial court's ruling unless the trial court abuses its discretion and prejudices the defendant. *In re Gormon*, 371 S.W.3d 100, 107 (Mo. App. E.D.2012).

During Doncasters' closing argument, counsel referenced an attempt by Plaintiffs to "get a $50 million payday." Plaintiffs' counsel argued that this reference opened the door to allowing Plaintiffs an opportunity to inform the jury that Plaintiffs would not receive a $50 million payday because half of the amount awarded would go to the Tort Victims' Compensation Fund pursuant to section 537.675 RSMo Supp.2001.[24] The trial court found this to be a fair response, and Doncasters offered no objection or argument at that time. Thereafter, Plaintiffs' reference during argument to the Tort Victims' Compensation Fund drew only a general objection from Doncasters' counsel unsupported by any legal or factual argument.

In *Henderson v. Fields,* the trial court allowed plaintiffs' counsel to inform the jury that half of any punitive damages award would go to Missouri Tort Victims' Compensation Fund. 68 S.W.3d 455, 470 (Mo.App. W.D.2001). On appeal, the Court noted that the argument was improper because it went beyond the evidence and instructions in the case. *Id.* However, the Court did not find reversible error where defense counsel failed to preserve the issue for appeal by offering only a vague "objection" without including a legal or factual basis for the objection. *Id.* Here, like the defense counsel in *Henderson,* counsel for Doncasters failed to preserve the issue for appeal by not supporting its objection with any legal or factual basis.

■ Moreover, "the law indulges a liberal attitude toward closing argument, particularly where the comment complained of is a fair retort or responds to prior argument of opposing counsel." *Hammer v. Waterhouse*, 895 S.W.2d 95, 106 (Mo.App. W.D.1995). With this principle in mind, Missouri Courts have allowed otherwise improper arguments as retaliation to opposing counsel's arguments. *See Amador v. Lea's Auto Sales & Leasing, Inc.,* 916 S.W.2d 845, 851 (Mo.App. S.D.1996) (finding the trial court did not abuse its discretion in allowing plaintiff to imply that the defendant had insurance as retaliation to defendant's introduction of testimony and argument stressing the small size of the defendant); *Hammer,* 895 S.W.2d at 106–07 (allowing defense during closing argument to imply that there were other defendants that plaintiff could pursue in order to respond to portions of the plaintiff's closing argument leading the jury to believe the plaintiff had no other recourse). Here, we cannot say that the trial court abused its discretion in allowing reference to the Tort Victims' Compensation Fund in

24. Section 537.675 establishes the Tort Victims' Compensation Fund for the deposit of fifty percent of punitive damages awards.

light of Doncasters' argument that Plaintiffs sought a "$50 million payday."

### d. Joint Verdict Form on Punitive Damages

 Lastly, Doncasters argues that the trial court erred by submitting the issue of punitive damages in a joint verdict form for all Plaintiffs. Doncasters claims that this resulted in a joint award that was not based on the claims of each individual Plaintiff. However, Doncasters did not raise this issue in an objection to the trial court. In fact, during the instruction conference, counsel for Doncasters agreed that the parties reached an agreement as to the form of the verdict. By failing to raise an objection to the trial court, Doncasters has waived the argument on appeal. *See* Rule 70.03 (stating that "[n]o party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection").

### e. Conclusion

The trial court committed no prejudicial error during the second phase of the trial. Accordingly, Doncasters' request for a new trial is denied.

### 4. Conclusion as to Plaintiffs' Cross–Appeal

The trial court erred in granting Doncasters' motion for judgment notwithstanding the verdict because Plaintiffs made a submissible case for punitive damages. Doncasters' request for a new trial is denied as the trial court committed no prejudicial error during the second phase of the trial.

### III. CONCLUSION

The portion of the trial court's judgment entered upon the jury's verdicts awarding Plaintiffs a collective $20 million in compensatory damages, $4 million for each wrongful death claim, is affirmed. The judgment notwithstanding the verdict on the issues of punitive liability and punitive damages is reversed and the cause is remanded with instructions to enter judgment in accordance with the jury's verdict awarding Plaintiffs a collective $28 million in punitive damages, resulting in $5.6 million in punitive damages for each wrongful death claim.

GARY M. GAERTNER, JR., C.J., MARY K. HOFF, J., LAWRENCE E. MOONEY, J., PATRICIA L. COHEN, J., ROY L. RICHTER, J., ROBERT M. CLAYTON III, J., ANGELA T. QUIGLESS, J., and LISA VAN AMBURG, J., concur.

CLIFFORD H. AHRENS, J., concurs in part and dissents in part.

SHERRI B. SULLIVAN, J. and KURT S. ODENWALD, J., concur.

CLIFFORD H. AHRENS, Judge.

I concur with the majority in affirming the trial court's judgment awarding compensatory damages. However, I dissent in regard to Plaintiffs' cross-appeal on punitive damages. In my view, the record does not contain sufficient clear and convincing evidence from which a reasonable juror could conclude that, at the time of sale in 1996, Doncasters had actual knowledge of the specific defect on which the compensatory award is based. I would affirm the trial court's judgment notwithstanding the verdict (JNOV) as to punitive damages.

"No Missouri case has permitted submission of a punitive damage claim in a strict products liability case on the theory that the defendant should have known of a dangerous defect in its product." *School*

*Dist. of City of Independence, Mo., No. 30 v. U.S. Gypsum Co.,* 750 S.W.2d 442, 446 (Mo.App.1988). To make a submissible case, a plaintiff must prove that the defendant had actual knowledge of the defect. *Id.* And because punitive damages are extraordinary and harsh, the evidence must meet the "clear and convincing" standard of proof. *Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104, 111 (Mo. banc 1996). Neither Plaintiffs nor the majority opinion supply authority upholding an inference of actual knowledge based on expert speculation of what a defendant should or must have known, which describes Plaintiffs' evidence here. Moreover, even accepting Plaintiffs' charge that Doncasters must have known *something,* there is no evidence whatsoever that Doncasters was aware of *the* defect on which the compensatory verdict is based. Ample precedent suggests that "clear and convincing" requires more than the record contains here, even in a threshold submissibility determination.[1]

In *U.S. Gypsum,* the school district sought punitive damages from the manufacturer of a ceiling plaster containing asbestos, sold to the district from 1957 to 1969. The district's expert testified that he showed his asbestos research to USG's safety manager in 1955 and later wrote to USG "protesting the 'folly' of adding asbestos to gypsum." *Id.* at 447. The district also cited "USG's longstanding knowledge of the hazards of asbestos when used at its own plants, the burgeoning medical knowledge of the hazards of asbestos exposure in non-occupational settings, and continued reports of water damage to [plastered] ceilings" as facts sufficient to place USG on notice of the danger of its product. The trial court granted JNOV and the Western District affirmed, reasoning that, even if USG was informed of the expert's experiments and opinions concerning the potential danger of incorporating asbestos into gypsum products, and even accepting the district's characterization of USG's general knowledge of asbestos dangers and water damage to the district's ceilings, the evidence was insufficient to demonstrate USG's actual knowledge of, specifically, its plaster's propensity to release asbestos. *Id.* For the proposition that actual knowledge can be inferred from a defendant's general knowledge of product hazards, the district cited *Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322 (8th Cir.1985). The Western District deemed *Hale* inapposite because, there, the plaintiff adduced an internal memorandum in which Firestone sought a list of complaints regarding not only the product (a tire rim) but also, specifically, the danger associated with that product (explosive separations). Such evidence "strongly supported the finding of actual knowledge," whereas the school district produced no evidence comparable to the Firestone memo. *Id.*

Providing an even starker contrast from the present case than *U.S. Gypsum* is *Angotti v. Celotex Corp.,* 812 S.W.2d 742 (Mo.App.1991). There, the defendant's worker's compensation manager hired a lung disease expert to study the company's

---

1. There is an obvious tension between the standards of review applicable to this case. The majority correctly notes that the general standard of review for submissibility is whether the record contains any evidence to support the jury's verdict. However, when the precise issue before the court is whether the evidence supports a finding of actual knowledge warranting the imposition of punitive damages, the cases discussed *infra* instruct that the more specific standard applicable to that issue is "clear and convincing" evidence. There is a vast difference between the quantum and quality of evidence comprising "a complete absence of probative facts" (*i.e.,* none) versus "clear and convincing evidence." In my view, the latter applies here and supports JNOV.

plant. Both the expert and the manager who hired him submitted multiple and increasingly emphatic communications cautioning the defendant of the hazards of asbestos to employees and consumers and of the inevitability of resulting liability. Yet the majority of the court (J. Kennedy dissenting) still found the evidence insufficient to prove the defendant's actual knowledge of a specific health hazard to its insulators. *Id.* at 748–750. *See also Hogan v. Armstrong World Industries,* 840 S.W.2d 230 (Mo.App.1992) (following *Angotti* to conclude that evidence failed to establish defendant's actual knowledge of the dangers of asbestos at the time of plaintiff's exposure).

Likewise, in *Peters v. General Motors Corp.,* 200 S.W.3d 1 (Mo.App.2006), two GM engineers testified that they reported concerns to GM about the subject cruise control system, and 74 reports involving cruise control incidents were admitted into evidence. Yet the majority of the court (J. Lowenstein dissenting) still found the evidence insufficient to prove GM's actual knowledge of the specific design defect. "GM must have had actual knowledge of the cruise control's dangerous proclivity to permit a transient charge to enter the device and cause the vehicle on which it was installed to accelerate without driver input." *Id.* at 27. In *Sparks v. Consolidated Aluminum Co.,* 679 S.W.2d 348 (Mo. App.1984), involving slipping ladder feet, the defendant's engineer testified that there had been other claims of injury and that "there might have been a better substance" than the product in question. But the court deemed such evidence insufficient, noting that the evidence of other claims was too vague to establish knowledge of the particular danger at issue, and that the product was tested and certified and met applicable standards. *Id.* at 354. In *Lewis v. Envirotech Corp.,* 674 S.W.2d 105 (Mo.App.1984), the plaintiff asserted a "failure to test" theory, but the court held that evidence that the defendant relied on field tests and service reports rather than simulated tests was insufficient to submit the issue of punitive damages to the jury. *Id.* at 114.

Applying the above precedent to the record here, it becomes apparent that the evidence of Doncasters' actual knowledge of the blades' *specific* design defect is insufficient to make a submissible case. Even viewed in the most favorable light, Plaintiffs' strongest evidence is not clear and convincing evidence of Doncasters' actual knowledge of the specific defect supporting the compensatory award, namely the alloy and coating materials. As noted by the majority, Plaintiffs' experts testified about two unsuccessful endurance tests. But neither test identified the materials as the cause of failure. The first was interrupted because *both* the PWC and Doncasters products failed, so nothing about that test could have indicated an inferiority of Doncasters' product. The second test was interrupted due to "excessive stretching" caused by engine heat. The report stated that "the nearly burnt thru compressor turbine vane may have been a contributing factor to the excessive blade stretching .... *All of the other characteristics on the blades which ran 113.5 hours were exemplary.*" Thus none of the testing documentation suggested that Doncasters' coating and alloy materials were prone to cracking, corrosion and oxidation. As they were quoted in the majority opinion, the experts merely asserted that Doncasters knew of the unsuccessful tests and therefore knew that the blades were defective. Although the experts were prompted by counsel to utter the words "actual knowledge," logic dictates that, in reality, the experts were either speculating on Doncasters' state of mind, which is improper and inadmissible (but presented

here without objection), or opining as to what Doncasters *should have known* based on the tests, which didn't identify the specific defect. To the extent the testimony relates at all to the specific defect supporting the compensatory award, it is speculation deemed insufficient under Missouri law. From Dr. Hoeppner:

> Q: Did you determine whether or not Doncasters knew that the base material in the coating of the CT blade could not meet the operating parameters for the life limit of the 20 engine?
>
> A: Absolutely. They set a life limit— well, the time of the first overhaul, to my recollection, of 5000 hours. . . . and 3000 hours thereafter. They had no basis for doing that, and *they had to know that*. . . .

Ironically, Plaintiffs' counsel further illustrated this point at oral argument. Noting that the only difference between PWC's blades and Doncasters' blades was in the coating and alloy materials, he insisted that the defect *"had to have been* the inferior coating and/or in combination with the inferior substituted base metal. . . . *There was no other explanation* . . ." While this deduction may be sufficient as a basis for compensatory damages, it does not constitute clear and convincing evidence to prove Doncasters' actual knowledge of that specific defect for purposes of imposing punitive damages. (See footnote 1 *supra*.) Rather, the experts' testimony is mere speculation and conjecture as to what Doncasters should have known.

When punitive damages are at stake, Missouri precedent universally requires clear and convincing evidence of actual knowledge of the specific defect at issue. Measured against those cases, Plaintiffs' best evidence here—that the blades never passed a test in the subject engine—hardly constitutes sufficient evidence from which a reasonable juror could conclude, without leaping, that by 1996 Doncasters *actually* knew *specifically* that the alloy and coating materials rendered the blades defective.

A submissible case requires substantial evidence to support each element. *U.S. Gypsum*, 750 S.W.2d at 446. When the record is insufficient on the element of actual knowledge, it is unnecessary to address the sufficiency of the evidence of the defendant's alleged conscious disregard for others' safety. *Id.* at 448. Indeed, logic dictates that one must have *knowledge* of a danger in order to disregard it *consciously*. As such, this second prerequisite for punitive damages necessarily fails as well. Nevertheless, to exhaust any doubt, even examining the "conscious disregard" prong independent of its predicate, again Plaintiffs' strongest evidence fails to establish that Doncasters acted with "evil motive or reckless indifference." *See Peters*, 200 S.W.3d at 25. The record on this element, too, is insufficient to make a submissible case.

Because the remedy is so extreme, punitive damages should be applied sparingly and only when the evidence is "clear and convincing." *Peters*, 200 S.W.3d at 25. Plaintiffs failed to satisfy this standard. I would affirm the trial court's JNOV in favor of Doncasters as to punitive damages.